Sean Michael MCGUIRE, Appellant

v.

The STATE of Texas, Appellee

and

The State of Texas, Appellant

v.

Sean Michael McGuire, Appellee

NO. 01–14–00240–CR, NO. 01–14–00241–CR, NO. 01–14–01023–CR

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued May 10, 2016

Rehearing Overruled July 7, 2016

Kristen Jernigan, Georgetown, TX, for Appellant.

John F. Healey, Jr., District Attorney, Fort Bend County, TX, Gail Kikawa

McConnell, Assistant District Attorney, Richmond, TX, for State.

Panel consists of Chief Justice Radack and Justices Massengale and Brown.

## OPINION

Harvey Brown, Justice

This is a fatality DWI case. The driver, Sean McGuire, refused consent when a police officer asked him to submit his blood for analysis of its alcohol concentration. Despite his lack of consent, and without a warrant, the police officer obtained a blood sample at a local hospital. The blood draw occurred approximately 90 minutes after the collision and revealed an alcohol concentration that was twice the legal limit. McGuire had two prior out-of-state DWIs, which served to enhance this third DWI to a third-degree felony.

In two separate indictments, McGuire was indicted for (1) felony murder, which is a first-degree felony under Section 19.03(b)(3) of the Texas Penal Code,[1] (2) intoxication manslaughter, which is a second-degree felony under Section 49.08,[2] and (3) failure to stop and render aid, which in this case is a second-degree felony.[3] The jury convicted McGuire of felony murder. It also convicted him of failure to stop and render aid.

After trial, the State asserted that the intoxication manslaughter charge—a charge that was submitted to the jury but on which the jury was not allowed to convict if it returned a guilty verdict for murder—remained pending. McGuire sought habeas relief, arguing that further prosecution on the intoxication manslaughter charge violated double jeopardy because a jury already convicted him of murder. The trial court granted relief and dismissed the pending intoxication-manslaughter charge.

McGuire appeals his two convictions.[4] The State appeals the habeas order.[5] This opinion resolves all three appeals. First, we conclude that the blood draw was unconstitutional and reverse the murder conviction. In doing so, we address only those issues raised in the appeal of the murder conviction that we view as necessary for the case to be remanded for further proceedings on that charge. These include (1) whether the two out-of-state DWIs may enhance this DWI offense to a felony and (2) the venue motion. The other appellate issues that are mooted by our holding are not addressed. TEX. R. APP. P. 47.1 (requiring opinion to address issues necessary to final disposition). Second, we affirm the conviction for failure to stop and render aid. Third, given the disposition of the murder appeal, we conclude that the basis for granting habeas

1. TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2011) (felony murder); see TEX. PENAL CODE ANN. § 49.09(b)(2) (West Supp.2015) (enhancing DWI to felony).

2. TEX. PENAL CODE ANN. § 49.08 (West 2011). Intoxicated manslaughter is a combination of driving while intoxicated—which is a misdemeanor offense (with some exceptions) under Section 49.04—and a resulting death. See TEX. PENAL CODE ANN. §§ 49.04, 49.09 (establishing DWI as misdemeanor); id. §§ 49.045, 49.07, 49.08, 49.09 (establishing exceptions for which offense is charged as felony).

3. TEX. TRANSP. CODE ANN. § 550.021 (West Supp.2015).

4. McGuire v. State, No. 01-14-00240-CR (challenging conviction for felony murder); McGuire v. State, No. 01-14-00241-CR (challenging conviction for failing to stop and render aid).

5. State v. McGuire, No. 01-14-01023-CR (challenging trial court order granting habeas relief and dismissing intoxication manslaughter charge on double-jeopardy grounds).

relief is now moot and vacate the trial court's order granting habeas relief.

## Background

After attending a benefit at a bar for more than five hours, McGuire was driving home shortly after midnight when he struck a motorcycle on a rural road. Both vehicles were traveling in the same direction when McGuire overcame the motorcycle and his truck's front bumper became entangled with the motorcycle's back fender. The entangled truck and motorcycle traveled together for some distance. The motorcycle eventually slipped down and became lodged under McGuire's truck. McGuire's truck then dragged the motorcycle to the next intersection, with sparks coming from both vehicles, where the motorcycle finally broke loose and slid to a stop. At some point during the process, the motorcycle driver, David Stidman, was knocked off his motorcycle. Stidman died from his injuries at the scene.

The parties contested the visibility of Stidman's motorcycle. There was evidence that it was a dark color and had two small backlights instead of the more common large, central taillight. The evidence was inconsistent whether those two small lights were functioning. Stidman's father testified that the lights were working that evening. However, McGuire stated repeatedly on the night of the collision that he did not see any lights before impact, and his expert testified that he was denied access to determine whether the lights were functioning properly.

McGuire did not testify at trial; however, various witnesses testified to statements he made the night of the collision while police were investigating. McGuire told these witnesses that he never saw the motorcycle. He heard a noise on impact, thought he may have hit "something or someone." He then turned his vehicle back to the direction from which he had been driving to determine what had occurred, suggesting that he was unaware that he had collided with a motorcycle and dragged it down the road. After he turned his vehicle around, he saw nothing along the shoulder of the road, but he did not stop to investigate. Instead, he drove to a nearby gas station and called his mother and two police acquaintances, who called law enforcement to begin its investigation.

Meanwhile, two other drivers saw Stidman's body lying near the road a short distance from the gas station. One of the drivers called for emergency assistance. Emergency personnel arrived within minutes of the collision, but Stidman was already dead.

McGuire remained at the gas station until police officers arrived. They interviewed him briefly and then drove him back to where Stidman's body had been found. While some police officers reported that McGuire showed no signs of intoxication, others stated that he had glassy eyes, smelled of alcohol, and was unsteady on his feet.

Based on indications that McGuire was driving while intoxicated and because the accident resulted in a death, one of the officers took McGuire to a local hospital to have his blood drawn to determine its alcohol concentration. McGuire refused consent to the blood draw. The police obtained a blood sample without McGuire's consent and without taking any steps to obtain a warrant. A police officer testified that he did so based on a Transportation Code provision that states that an officer "shall require the taking of a specimen" under certain circumstances, including when an officer reasonably believes a driver was operating a vehicle while intoxicated and a person died as a result of an accident involving that driver. *See* Tex.

TRANSP. CODE ANN. § 724.012(b) (West 2011). McGuire's blood was drawn less than 90 minutes after the accident. The blood specimen had an alcohol concentration of 0.16—twice the legal limit.

In one indictment, McGuire faced charges of murder (because he had two previous out-of-state DWIs, which were used to enhance this DWI offense to a felony, thereby enabling the State to prosecute for felony murder) and intoxication manslaughter. Through a second indictment, McGuire also was charged with failure to stop and render aid. All charges were presented to one jury in a single trial.

McGuire sought pretrial habeas relief in 2012, arguing that the murder indictment failed to allege an offense because the two "act[s] clearly dangerous to human life," as described in the indictment, were not acts at all, but, instead, simple omissions: failing to (1) maintain an adequate lookout for traffic and road conditions and (2) take proper evasive actions. *See McGuire v. State*, No. 01–11–01089–CR, 2012 WL 344952, at *1 (Tex.App.—Houston [1st Dist.] Feb. 2, 2012, pet. ref'd) (mem. op., not designated for publication). This court held that the trial court did not abuse its discretion by denying habeas relief because failure to keep a proper lookout can occur through an act. *Id.* at *2. The case proceeded on all charges.

Before trial, McGuire filed a motion to transfer venue. The trial court held a hearing and denied the motion. The trial judge stated that "if we can't get a jury then I'll revisit this motion." On the first day of trial, McGuire reurged his motion based on an article published in the local newspaper the day before trial that quoted the prosecutor regarding potential evidence in the case. The trial court again denied the motion, saying that it would revisit it after voir dire if they could not get a fair jury. At the conclusion of voir dire, various veniremembers were struck for cause or by peremptory strikes. Twelve jurors plus one alternate were seated without McGuire reurging his venue motion.

At trial, the three charges, as well as various lesser-included offenses, were submitted to the jury. Before the charge was read to the jury, McGuire successfully argued that the jury should be instructed that it could convict on murder, convict on intoxication manslaughter, or acquit on both, but that it could not convict on both of those charges. That limitation was included in the jury charge. The jury returned a verdict of guilty of murder. The jury assessed punishment at 18 years' confinement and imposed a fine. The jury also convicted on failure to stop and render aid. The jury assessed punishment at 5 years' confinement and imposed another fine.

The day after the trial court signed the judgment of conviction, the Fort Bend County District Attorney's office stated that the intoxication manslaughter charge "will remain pending until the disposition of the appeal" of the murder charge. According to McGuire, at that point, he "was brought before a magistrate and formally charged with intoxication manslaughter (even though he had already been tried for that offense) and a[ ] bond was set."

McGuire then filed an application for a writ of habeas corpus, arguing that the State violated his right against double jeopardy. He argued that he "has already been convicted of murder for causing the death of David Stidman and is currently charged with Intoxication Manslaughter for causing the death of David Stidman. This is an unconstitutional double jeopardy violation." Following a hearing, the trial court granted McGuire's application for habeas corpus and dismissed the intoxi-

cation manslaughter charge. The State appeals that order.

## The Felony–Murder Conviction

In his appeal of the felony-murder conviction, McGuire raises eight issues, including that the warrantless, nonconsensual blood draw violated his constitutional rights. We agree. As a result, four other issues raised in his appeal are moot: whether the trial court abused its discretion by admitting evidence of the two prior out-of-state DWIs absent adequate proof that McGuire was the defendant in those cases, admitting evidence without proof of chain of custody, and denying his challenge for cause on a venireperson, and whether there was legally sufficient evidence on which to convict him of felony murder. We do not reach those four issues. *See* TEX. R. APP. P. 47.1 (opinion must dispose of issues necessary to disposition of appeal).

We do reach other issues that will be necessary in a new trial. These include whether the felony-murder indictment fails to state an offense and is fundamentally defective, whether the trial court abused its discretion by denying McGuire's venue motion, and whether an earlier, out-of-state probated sentence constitutes a valid final conviction for enhancement purposes to make felony murder an available charge.

We begin with McGuire's challenge to the indictment because, if he prevails on that challenge, he would be entitled to judgment in his favor on that charge. *See Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex.1999) (explaining that generally, when party presents multiple grounds for reversal of judgment on appeal, appellate courts should first address issues that would require rendition); *see also* TEX. R. APP. P. 43.3.

## A. Challenge to the indictment

McGuire contends that the indictment for felony murder is fundamentally defective because it fails to allege an offense. Specifically, he argues that felony murder requires that the defendant engage in an "act," yet the indictment against him alleged only omissions, not acts. McGuire contends that this defect requires reversal.

This is not the first time McGuire has raised this issue with this court. As he readily admits in his brief, he argued in a 2012 habeas proceeding "that the indictment was invalid because it failed to state an offense ... [in that] an 'omission' such as a failure to take action, is not an act...." McGuire quotes extensively from the memorandum opinion, in which this court rejected his contention for two reasons. First, "the law in Texas does impose a duty on drivers to maintain an adequate lookout and take proper evasive actions when necessary ... and the failure to abide by these and other traffic laws is a voluntary act or omission upon which a criminal offense may be based." *McGuire*, 2012 WL 344952, at *2. Second, "the indictment alleges the affirmative voluntary actions of consuming alcohol and driving on a public street." *Id.* at *3. McGuire argues that the issue was wrongly decided.

### 1. Standard of review

■ "An issue raised by an indictment may present a question of law." *Hollin v. State*, 227 S.W.3d 117, 120 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). "The question is subject to de novo review when its resolution does not require an evaluation of the credibility and demeanor of a witness." *Bearnth v. State*, 361 S.W.3d 135, 141 (Tex.App.—Houston [1st Dist.] 2011, pet. ref'd).

### 2. Felony-murder indictment

Felony murder essentially is "unintentional" murder committed in the course of a felony. *Lomax v. State*, 233 S.W.3d 302, 305, 306 (Tex.Crim.App.2007); *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex.Crim.App.2014). The Texas Penal Code provides that felony murder occurs when a person

> commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3). There is no requirement of a culpable mental state for "the act of murder." *Lomax*, 233 S.W.3d at 306.

Under this statute, the State must prove five things, the second of which McGuire challenges: "(1) an underlying felony, (2) an act clearly dangerous to human life, (3) the death of an individual, (4) causation (the dangerous act causes the death), and (5) a connection between the underlying felony and the dangerous act ('in the course of and in furtherance of . . . . or in immediate flight from')." *Contreras v. State*, 312 S.W.3d 566, 583–84 (Tex. Crim.App.2010). The "act clearly dangerous to human life" must be the cause of the victim's death. *Rodriguez*, 454 S.W.3d at 507. Whether the act is clearly dangerous to human life is measured under an objective standard, not the subjective belief of the actor. *Lugo–Lugo v. State*, 650 S.W.2d 72, 81 (Tex.Crim.App.1983).

"An indictment for felony murder is not required to allege the constituent elements of the underlying felony." *Tata v. State*, 446 S.W.3d 456, 463 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citations omitted). "The proper test to determine if a charging instrument alleges 'an offense' is whether the allegations in it are clear enough that one can identify the offense alleged." *Teal v. State*, 230 S.W.3d 172, 180 (Tex.Crim.App.2007). Factual specificity is not required: "a written instrument is an indictment . . . if it accuses someone of a crime with enough clarity and specificity to identify the penal statute under which the State intends to prosecute, even if the instrument is otherwise defective." *Duron v. State*, 956 S.W.2d 547, 550–51 (Tex.Crim.App.1997). Stated another way, an indictment that tracks the language of the penal statute generally will be legally sufficient without the State alleging facts that are merely evidentiary in nature. *See Moreno v. State*, 721 S.W.2d 295, 300 (Tex.Crim.App.1986).

### 3. The McGuire indictment states an offense

The felony-murder indictment alleged at least two acts "clearly dangerous to human life": McGuire failed to maintain an adequate lookout and failed to take proper evasive actions. McGuire argues that these are omissions, not acts. But both "omissions" can also involve acts. "[W]hile an omission is, by definition, a failure to act, that does not mean that a defendant charged with an omission may not also engage in some type of act during the course of that omission. There can be proof of an additional dangerous act beyond the felonious act (or omission) of the underlying felony." *Rodriguez v. State*, 408 S.W.3d 628, 637 (Tex.App.—Austin 2013) (Jones, C.J., dissenting), *rev'd*, 454 S.W.3d 503 (Tex.Crim.App.2014).

With regard to failure to maintain an adequate lookout, this conduct can occur through complete inaction (i.e., when a driver observes nothing and makes no physical movements as a result, as McGuire argues occurred here) or through an affirmative action that might better be

described as a distraction (i.e., when a driver diverts his eyes away from the road to an object in the vehicle that has distracted him). *See Montgomery v. State,* 369 S.W.3d 188, 195 (Tex.Crim.App.2012) (driver alleged to have "failed to maintain proper lookout, at least partly as a result of the distraction created by her use of the cell phone"); *Cook v. State,* 328 S.W.3d 95, 102 (Tex.App.—Fort Worth 2010, pet. ref'd) (driver "was not maintaining a proper lookout when approaching this curve because she was distracted by her CD player"); *see also Webb v. State,* No. 01–02–01039–CR, 2003 WL 22724623, at *3 (Tex.App.—Houston [1st Dist.] Nov. 20, 2003, pet. ref'd) (mem. op., not designated for publication) (driver alleged to have failed to keep proper lookout, in part, "because he was momentarily distracted by [passenger] opening car door to vomit").

Likewise, the conduct of failing to take evasive action can occur through complete inaction (i.e., driving straight without making any physical movements and without witnessing any reason to take evasive action) or through an affirmative, voluntary action. An example of the latter would be making the voluntary decision to purposefully drive over debris in the road, having concluded that making an evasive maneuver might cause more severe damage or injury.

Our view that an omission can also include, in some circumstances, an act is not contradicted by the Texas Court of Criminal Appeals decision in *Rodriguez v. State,* 454 S.W.3d 503 (Tex.Crim.App.2014). That case involved a felony-murder charge against a mother whose infant died of malnutrition and dehydration. *Id.* at 505. The underlying felony was injury to a child. *Id.* The acts alleged were (1) withholding sufficient nutrition and fluid to sustain life and (2) starving the child. *Id.*

The Court of Criminal Appeals first noted that, "while an injury to a child offense can be based on an act or omission, the felony murder statute makes clear that an 'act clearly dangerous to human life' must be the cause of the death of the victim." *Id.* at 507. An "act" is statutorily defined as "a bodily movement, whether voluntary or involuntary...." Tex. Penal Code Ann. § 1.07(a)(1). Conversely, an "omission" is defined as a "failure to act." *Id.* § 1.07(a)(34). According to the *Rodriguez* Court, both items listed in the mother's indictment involved "*not* performing some act that was required of her" and fell "squarely within the definition of an omission," not an "act." *Rodriguez,* 454 S.W.3d at 507.

Next, the *Rodriguez* Court rejected the argument that withholding food—an omission—includes within it the clearly dangerous act of "giving her son some food, but not enough for him to survive." *Id.* at 508. Focusing on the "clearly dangerous" requirement, the Court held that the act of giving food, however small, would serve to prolong life, not be dangerous to it. *Id.* Therefore, the aspect of her behavior that could be described as an act (i.e., giving food) was the opposite of dangerous to the infant's life. It was only the omission aspect (i.e., not giving enough food) that was dangerous and caused his death.

Then, focusing on what constitutes an "act," the *Rodriguez* Court cautioned against conceptualizing an omission as an incomplete attempt at an act because doing so "renders any distinction between the two words meaningless," and any omission would then be susceptible to being phrased as an act. *Id.* Later, in *Hudson v. State,* 449 S.W.3d 495 (Tex.Crim.App. 2014), the Court of Criminal Appeals described its earlier *Rodriguez* holding as follows: "[T]he cause of death that gives rise to a felony murder conviction cannot

be based solely on an omission." *Id.* at 498 n. 7. There must be an act that is clearly dangerous to human life, and that act must cause the death. *See* TEX. PENAL CODE ANN. § 19.02(b)(3); *Rodriguez,* 454 S.W.3d at 508.

Unlike the omissions in the *Rodriguez* indictment, the omissions in the McGuire indictment' could be regarded, in some circumstances, as voluntary acts. For example, if the facts supported the statement, the indictment could have alleged that McGuire failed to maintain a proper lookout because he was texting or looking at the floorboard for something he had dropped. These clearly would be acts. We conclude that the McGuire indictment adequately tracked the language of the penal statute to put forth a felony-murder charge based on dangerous inattentiveness in the course of a felony DWI.

There is a second reason that we reject McGuire's contention that the indictment was defective: McGuire's voluntary act of driving after consuming alcohol could be, depending on the evidence, an act clearly dangerous to human life. *See McGuire,* 2012 WL 344952, at *3. The Court of Criminal Appeals stated in *Johnson v. State* that the felony, itself, may satisfy the requirement of an act clearly dangerous to human life. 4 S.W.3d 254, 255–58 (Tex. Crim.App.1999) (holding that same act may constitute both underlying felony and act clearly dangerous to human life, except manslaughter); *see Lawson v. State,* 64 S.W.3d 396, 400–01 (Tex.Crim.App.2001) (Cochran, J., concurring) (same).

*Johnson* was subsequently summarized by the Court of Criminal Appeals in *Lomax* as holding that a "felony-murder conviction can be based upon the underlying felony without proof of any additional dangerous act beyond that covered by the underlying felony." 233 S.W.3d at 303 n. 4; *see id.* at 310 n. 29. The victim's death in *Lomax* occurred in the course of the defendant's "commission of an inherently dangerous felony DWI." *Id.* at 303 n. 4. The Court explained that felony-murder does not require a separate affirmative act by the driver such as speeding, tailgating, or weaving through traffic because such an argument "would resurrect the judicially created merger doctrine" *Id.* at 310 n.29.[6] The Court also rejected the defendant's contention that a DWI homicide must "be prosecuted exclusively as intoxication manslaughter" because the plain language of the statute "does not exclude felony DWI as an underlying felony for a felony-murder prosecution." *Id.* at 309–11.

Therefore, we conclude that the indictment is not fundamentally defective for failing to state an offense. We overrule McGuire's first issue.

## B. Challenge to allowing probated, out-of-state DWI conviction to enhance offense

The State presented evidence that McGuire had two prior DWIs in Iowa approximately seven years before this offense. The first was in January 2003; the second was in May 2003. McGuire did not challenge the admissibility of this evidence. Instead, he argues that the second of the two DWIs does not qualify as an underlying DWI conviction for third-offense felony DWI purposes because he received a probated sentence as a result of that charge. According to McGuire, without the second DWI offense counting against him, there

6. *Cf. Bigon v. State,* 252 S.W.3d 360, 370 (Tex.Crim.App.2008) (in felony-murder case, indictment specified felony-DWI as felony being charged and listed driving vehicle across center line into oncoming traffic as dangerous act; Court stated that State had to establish "both" to convict on felony murder).

was no legal basis for categorizing this offense as his *third* DWI—which was necessary to enhance the charge to a felony DWI under Section 49.09(b)(2) of the Penal Code and to charge and convict him of felony murder. Absent this conviction, should this case be retried, McGuire would not be subject to conviction for felony murder but could, at most, be convicted of intoxication manslaughter.

### 1. Standard of review

Whether the trial court misapplied Section 49.09(b)(2) of the Penal Code is a matter of statutory construction, which is reviewed de novo. *See Tapps v. State*, 294 S.W.3d 175, 177 (Tex.Crim.App.2009).

### 2. Texas Penal Code section 49.09

■ A DWI offense is a third-degree felony "if it is shown on the trial of the offense that the person has previously been convicted: ... (2) two times of any *other offense relating to the operating of a motor vehicle while intoxicated ....*" Tex. Penal Code Ann. § 49.09(b) (italics added). The italicized phrase is a defined term in the statute and includes "an offense under the laws of another state that prohibit the operation of a motor vehicle while intoxicated." *Id.* § 49.09(c)(1)(F). The statute also provides that a conviction under Texas Penal Code section 49.04 (driving while intoxicated) is a "final conviction" "whether the sentence for conviction is imposed or probated." *Id.* § 49.09(d). Thus, a DWI offense is a felony if the driver has been convicted two times of operating a vehicle while intoxicated, whether the convictions occurred in Texas or in another state.

### 3. Iowa Code provisions

Iowa Code section 321J.2 provides that a person commits the offense of "operating while intoxicated" if he operates a motor vehicle in the state while under the influence of an alcoholic beverage or while having a blood-alcohol concentration of .08 or more. Iowa Code Ann. § 321J.2(1) (2013). Section 907.3 permits the Iowa trial court, upon a plea of guilty, to defer judgment and place the defendant on probation. *Id.* § 907.3(1); *see id.* § 321J.2(3)(b)(*l* ). "Upon fulfillment of the conditions of probation ... the defendant shall be discharged without entry of judgment." *Id.* § 907.3(1)(c).

Section 321J.2 addresses the effect of a successfully probated sentence. It provides that, "[i]n determining if a violation charged is a second or subsequent offense for purposes of criminal sentencing ... under this chapter ... [d]eferred judgments entered pursuant to section 907.3 for violations of this section shall be counted as previous offenses." *Id.* § 321J.2(8)(b). This provision is similar to Section 49.09(d) of the Texas Penal Code quoted above.

### 4. Whether the Iowa probated sentence is a final conviction for Section 49.09 purposes

■ McGuire argues that the probated sentence was not a final conviction because Section 49.09(b) expressly states that the defendant must be "convicted" and, to the extent Section 49.09(d) allows probation to qualify as a conviction, that provision is limited to Texas offenses.

The State responds that the Iowa offense qualifies as a conviction because, under Iowa Code section 321J.2(8)(b), the State of Iowa treats it as a conviction. The State also cites cases interpreting Sections 12.41 and 12.42 of the Texas Penal Code, which provide a method to classify out-of-state offenses and dictate how various levels of offenses will enhance punishment for habitual offenders.

The Court of Criminal Appeals has explained that the Texas felony-DWI law found in Section 49.09 allows "prior intoxication-related convictions [to] serve the

purpose of enhancing the *offense*" being charged while Section 12.42 permits prior convictions to "serve the purpose of enhancing [the] *punishment*" for that offense. *Gibson v. State*, 995 S.W.2d 693, 696 (Tex.Crim.App.1999) (emphasis added). The two concepts are "distinguishable," and the limitations found in Section 12.42 do not apply to offense enhancement under Section 49.09. *See id.* Therefore, the cases interpreting Sections 12.41 and 12.42 as they relate to punishment enhancement do not address the question of offense enhancement. Instead, the Texas and Iowa provisions that directly address offense enhancement apply.

The Texas statute states that two prior DWI convictions will make the third DWI a felony. TEX. PENAL CODE ANN. § 49.09(b). It further provides that out-of-state offenses may count as one or more of the underlying offenses. *Id.* § 40.09(c)(1)(F). The Iowa statute states that an intoxication offense is treated as a conviction even when the defendant's sentence is probated. IOWA CODE ANN. § 321J.2(8)(b). Texas law reaches the same result, allowing probated sentences to qualify as convictions. TEX. PENAL CODE ANN. § 49.09(d). Accordingly, whether McGuire's second DWI is analyzed under Texas or Iowa law, the probated sentence qualifies as a conviction. We hold that McGuire's second out-of-state conviction may enhance the DWI charged in this prosecution to a felony DWI under Section 49.09(b)(2).

We overrule McGuire's sixth issue.

### C. Warrantless blood draw

McGuire next argues that the trial court erred by denying his motion to suppress the results of a blood draw taken to determine his blood-alcohol level shortly after the automobile accident because the warrantless, nonconsensual blood draw violated his Fourth Amendment rights as recognized in *Missouri v. McNeely*, ____ U.S. ____, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013). Because the drawing of a person's blood is considered a search under the Fourth Amendment, McGuire argues that a warrant was required once he refused consent. *See Schmerber v. California*, 384 U.S. 757, 769–70, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966) (blood draw is search under Fourth Amendment). He further argues that the State did not satisfy its burden to show any exigent circumstances to bring the nonconsensual search within a recognized exception to the warrant requirement. *See Amador v. State*, 221 S.W.3d 666, 672–73 (Tex.Crim.App.2007) (burden is on State to prove exigent circumstances to excuse warrant requirement).

The State argues that the warrantless, nonconsensual blood draw was constitutional and that, even if were unconstitutional, the trial court did not commit harmful error by denying McGuire's motion to suppress.

#### 1. Standard of review

We review a ruling on a motion to suppress evidence under the abuse-of-discretion standard. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex.Crim.App.2008). We give "almost total deference to a trial court's express or implied determination of historical facts," but we "review de novo the court's application of the law of search and seizure to those facts." *Id.*

#### 2. Fourth Amendment requirements

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to

be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. While the text of the Fourth Amendment does not expressly require a search warrant, its logical inference is "that a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011).

█ There are recognized exceptions to the warrant requirement. *See McNeely*, 133 S.Ct. at 1559. One such exception is for exigent circumstances, meaning that law enforcement has an urgent need to conduct a search without adequate time to secure a warrant. *Id.* Exigent circumstances may exist, for example, when law enforcement is "providing aid or assistance to persons whom law enforcement reasonably believes are in need of assistance," "protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous," and "preventing the destruction of evidence or contraband." *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex.Crim.App.2007).

When the State asserts that exigent circumstances exist, we look to the totality of the circumstances to determine whether law enforcement faced an emergency that justified acting without a warrant, with each case determined "on its own facts and circumstances." *McNeely*, 133 S.Ct. at 1559 (quoting *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374 (1931)); *see Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (applying totality-of-the-circumstances approach and upholding warrantless search

because officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence" (internal quotation and citation omitted)). The burden is on the State to prove that the warrantless search was reasonable under the totality of the circumstances. *See Amador*, 221 S.W.3d at 672–73.[7]

█ Two years ago, in *McNeely*, the United States Supreme Court held that the exigency exception for preventing the destruction of evidence does not create a "per se" rule excusing an officer from obtaining a warrant in the context of a suspected drunk driver whose alcohol content is steadily diminishing through the natural dissipation of alcohol. 133 S.Ct. at 1563, 1568. Instead, whether a warrant is required for a nonconsensual blood draw of a DWI suspect must be decided using the same totality-of-the-circumstances test we use for exigency exceptions in other circumstances. *Id.* at 1568.

We must address the effect of the *McNeely* opinion on McGuire's nonconsensual blood draw, specifically in light of the Texas implied-consent statute—Texas Transportation Code section 724.011—and the subsequent Court of Criminal Appeals decision of *State v. Villarreal*.[8]

### 3. The Texas implied-consent statute

█ A suspect may freely and voluntarily consent to a warrantless search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227–28, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d

---

7. There are other exceptions that do not incorporate a balancing test or analyze case-specific factors, such as a search of a person incident to a lawful arrest. *See McNeely*, 133 S.Ct. at 1559 n. 3.

8. The Court of Criminal Appeals issued a decision in the *Villarreal* case in November 2014, granted rehearing in February 2015, then denied rehearing as improvidently granted in December 2015 with a new opinion. *State v. Villarreal*, 475 S.W.3d 784, 817 (Tex. Crim.App.2015).

854 (1973); *Villarreal,* 475 S.W.3d at 799. Transportation Code section 724.011 is an implied-consent statute. TEX. TRANSP. CODE ANN. § 724.011(a) (West 2011). Under its terms, a driver is "deemed to have consented . . . to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration" if the "person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle . . . while intoxicated." *Id.* This implied consent is understood to be in exchange for the benefit and privilege of using the Texas roadways. *See Villarreal,* 475 S.W.3d at 790 (noting that State, in that case, had "suggested that a defendant, by driving on Texas roadways, which is a privilege and not a right, has impliedly consented to have his blood drawn under the limited situations described in the mandatory-blood-draw provision . . . .").

The statute grants an exception to the implied-consent rule in Section 724.013, which provides that a person may "refuse to submit to the taking of a specimen," effectively withdrawing the implied consent. TEX. TRANSP. CODE ANN. § 724.013 (West 2011). But, under the statute's terms, not everyone is allowed to withdraw their consent. *Id.* (making refusal provision subject to Section 724.012(b)).

Section 724.012(b) outlines the situations in which a person cannot withdraw consent. It mandates that a peace officer "shall require the taking of a specimen" of a person arrested for driving while intoxicated even if the person "refuses the officer's request to submit to the taking of a specimen voluntarily" if, among other reasons, the officer reasonably believes that, as a direct result of the accident, a person

has died (Section 724.012(b)(1)(A)) or, at the time of the arrest, the officer has reliable information from a credible person that the person has twice-before been convicted of a DWI offense (Section 724.012(b)(3)(B)).

Section 724.012(b) has been the subject of numerous constitutional challenges. *See, e.g., Villarreal,* 475 S.W.3d 784; *State v. Tercero,* 467 S.W.3d 1, 4 (Tex.App.—Houston [1st Dist.] 2015, pet. ref'd); *Douds v. State,* 434 S.W.3d 842 (Tex.App.—Houston [14th Dist.], 2014), *overruled on other grounds,* 472 S.W.3d 670 (Tex.Crim.App.2015). While the Texas Court of Criminal Appeals has not held the statute unconstitutional,[9] it has declared that the statute does not provide effective consent to a warrantless search if a suspect has expressly refused or revoked consent to the search. *Villarreal,* 475 S.W.3d at 800, 804. When a suspect refuses a blood draw, the Fourth Amendment requires either a warrant or an applicable exception to the requirement of a warrant. *See id.* at 815; *Gore v. State,* 451 S.W.3d 182, 198 (Tex.App.—Houston [1st Dist.] 2014, pet. ref'd). Thus, whether law enforcement might be excused from obtaining a warrant in the context of a DWI suspect with dissipating alcohol is analyzed under a totality-of-the-circumstances review for exigent circumstances. *Id.* at 797 (relying on *McNeely,* 133 S.Ct. at 1557–58).

To the extent search-and-seizure law changed because of *McNeely* and *Villarreal,* this court has held that the State may not rely on a "good-faith" exception to allow admission of evidence taken without a warrant in violation of the Fourth Amendment by arguing that the officer relied on a good-faith belief that a statute

9. The statute, by its own terms, does not address whether a warrant is required before a mandatory blood draw is taken; it simply

requires that the blood be drawn. *Villarreal,* 475 S.W.3d at 811; *see Tercero,* 467 S.W.3d at 11.

permitted the warrantless search. *Tercero*, 467 S.W.3d at 6, 8, 10 (holding that officer's good faith belief that Transportation Code permitted nonconsensual, warrantless blood draw "is irrelevant" to whether blood-draw results should be suppressed under Fourth Amendment); *see State v. Hill*, No. 03–13–00834–CR, 484 S.W.3d 587, 592–93, 2016 WL 690738, at *4 (Tex.App.—Austin Feb. 17, 2016, pet. filed) (analyzing Article 38.23 of the Texas Code of Criminal Procedure and holding, like in *Tercero*, that good-faith exception is limited to good-faith reliance on warrant and, absent issuance of warrant, does not apply).

We turn now to the question whether, in light of *McNeely*, *Villarreal*, and *Tercero*, the warrantless, nonconsensual blood draw was unconstitutional, making the trial court's denial of McGuire's motion to suppress erroneous.

### 4. Constitutionality of search

The State raises three arguments for concluding that the blood draw was constitutional and, therefore, the results of the blood test were admissible. First, it argues that the Texas implied-consent statute creates its own exception to the warrant requirement and that the *McNeely* Court recognized its viability. Next, it argues that the blood draw was reasonable under a general Fourth Amendment balancing test outside of any exception. Finally, it argues that exigent circumstances existed to justify the warrantless blood draw, namely, the difficulty that the law enforcement officers would have faced obtaining a warrant late at night when tasked with investigating a large-scale fatality accident.

### a. Whether the Texas implied-consent statute is its own exception to the warrant requirement

█ The State argues that the Transportation Code provides its own exception to the Fourth Amendment's warrant requirement. Both the United States Supreme Court and the Court of Criminal Appeals have rejected the contention that a statute may create a per se exception to a warrant requirement. *See McNeely*, 133 S.Ct. at 1561–63 (holding that "per se" statutory rule is not permissible under Fourth Amendment); *Villarreal*, 475 S.W.3d at 797–800 (holding that statute must fall "within a recognized exception to the warrant requirement"). With specific reference to the Texas implied-consent statute, the Court of Criminal Appeals held that "taken by themselves," the statute's provisions do not "form a constitutionally valid alternative to the Fourth Amendment warrant requirement." *Villarreal*, 475 S.W.3d at 813. Instead, for a warrantless blood test to be constitutional, the evidence must "fit within a recognized exception to the search-warrant requirement" even if the Transportation Code requirements have been met. *Id.* at 796. Thus, an officer's compliance with the Transportation Code does not, by itself, mean that the blood draw was constitutional. *See id.* at 811.

### b. Whether the search is constitutional under a "general Fourth Amendment balancing test"

█ The State next argues that the blood draw was reasonable under a general Fourth Amendment balancing test. Under *Villarreal*, although the State "has a substantial interest in preventing drunk driving," a balancing test cannot be invoked to conclude that a warrantless search was constitutional "unless [the search] falls within an established exception to the warrant requirement." *Id.* at 807–13; *see Tercero*, 467 S.W.3d at 8 (stating that "search of a person conducted pursuant to a criminal investigation re-

quires a search warrant or a recognized exception to the warrant requirement").[10] In other words, even if a comparison of the State's interest to the criminal defendant's privacy interest would weigh in the State's favor, the State still must obtain a warrant or fall within a recognized exception to the warrant requirement. Unless one of the recognized exceptions to the warrant requirement applies, the Fourth Amendment balancing test is not relevant to our inquiry into the constitutionality of the blood draw. *See Villarreal,* 475 S.W.3d at 807–13; *Tercero,* 467 S.W.3d at 8.

### c. Whether an exigency existed to permit a warrantless search

Finally, the State argues that exigent circumstances existed to justify the warrantless blood draw. Exigent circumstances exist when there is "no time to seek out a magistrate and secure a warrant." *McNeely,* 133 S.Ct. at 1560. The *McNeely* Court held that the ongoing dissipation of alcohol—which results in a steady destruction of evidence relevant to whether a person has violated a DWI law—by itself, does not supply the necessary exigency to permit a warrantless blood draw from a DWI suspect. *Id.* at 1561. "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at 1561; *see Sutherland,* 436 S.W.3d at 40–41 (holding that warrant was required because there was no exigency to justify warrantless blood draw). "Whether a

warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." *McNeely,* 133 S.Ct. at 1563. The Court explained, by hypothetical, why a categorical exception to the warrant requirement is not appropriate:

> Consider, for example, a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement.

*Id.* at 1561.

Since *McNeely,* courts have reviewed facts on a case-by-case basis to determine whether an exigency existed. One example is *Sutherland v. State,* 436 S.W.3d 28, 40–41 (Tex.App.—Amarillo 2014, pet.ref'd). There, the defendant was stopped at approximately 11:30 p.m. for driving while intoxicated. The officer "did not describe any factors that would suggest he was confronted with an emergency or any unusual delay in securing a warrant." *Id.* He did not make any "effort to obtain a warrant because he believed that the law required that he obtain a blood sample under the circumstances presented to him." *Id.* at 40. Although "[p]rocedures and obstacles in place for obtaining a warrant or the (un)availability of a magistrate may affect whether the police can obtain a warrant in an expeditious manner and may, therefore, lend themselves to an exigency that justi-

---

**10.** The State argues that *Villarreal* improperly rejected the balancing test because the United States Supreme Court has applied the balancing test without considering a special exception to the warrant requirement in *Riley v. California,* —— U.S. ——, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014). But *Riley* dealt with

"the reasonableness of a warrantless search incident to a lawful arrest"—the third exception recognized in *Villarreal. Id.* at 2482; *see Villarreal,* 475 S.W.3d at 796 (recognizing the "search-incident-to-arrest exception" to the warrant requirement). Thus, the search fell within a recognized exception.

fies a warrantless blood draw," such obstacles did not exist in that case. *Id.* at 40–41. A magistrate was available on the night of the defendant's arrest and "testified that he permit[s] an officer seeking a search warrant for a blood draw in a DWI case to interrupt court proceedings due to the dissipating nature of the evidence and sensitive time frame at issue." *Id.* For these reasons, the exigent circumstances exception did not apply and the police officer should have obtained a warrant. *Id.*

 McGuire's collision occurred in Fort Bend County at 12:40 a.m. The Department of Public Safety, which led the accident investigation, had three officers at the scene, including the lead trooper in charge of the investigation, Trooper M. Filmore. In addition, at least four Fort Bend County Sheriff's Office personnel offered their assistance at the scene. Lieutenant J. Ressler, who works for Fort Bend County, testified that he was at the accident scene roughly one hour and was asked only to "supervise the rerouting of traffic and secur[e] the scene."

Lead Trooper Tomlin testified that he took "zero steps" to obtain a warrant for a blood draw. He testified that, because someone had died in the accident and McGuire appeared intoxicated, McGuire was subject to a "mandatory blood draw" under Texas law. He took McGuire to the hospital to have his blood drawn. McGuire refused, and he told McGuire "that it was mandatory and the choice wasn't up to him." McGuire's blood was drawn, despite his refusal and without a warrant, at 2:03 a.m.—approximately 90 minutes after the accident. There was no evidence that any other officer attempted to secure a warrant either. Accordingly, there was no evidence that the officers encountered delays or obstacles to obtaining a timely warrant.

Fort Bend County had a process in place to assist officers in obtaining warrants. It had assistant district attorneys on call at all hours. Officers, or the assistant district attorneys, could fax transmissions to any of "about 20" Fort Bend County judges at their homes to process a warrant or the officers could take a warrant request to the judges personally. Nonetheless, no effort was made to obtain a warrant by any of the seven officers at the scene. As discussed in *McNeely*, one officer could have taken steps to secure a warrant while another officer transported McGuire to a medical facility to have his blood drawn. *McNeely*, 133 S.Ct. at 1561. "In such a circumstance, there would be no plausible justification for an exception to the warrant requirement." *Id.*; *see Sutherland*, 436 S.W.3d at 40–41; *State v. Ruiz*, 2015 WL 5626252, at *5 (Tex.App.—Corpus Christi 2015).

The State lists 24 facts that it argues establish exigent circumstances to justify the warrantless search. These include that the accident occurred late at night, McGuire was no longer at the scene when the police arrived and had to be brought back, the accident site needed to be secured and investigated, and officers needed to manage traffic in the area. Additionally, although prosecutors were on call day and night to assist officers with obtaining a warrant, the magistrates, themselves, were not "on call" and would have had to be located. The State notes that, on at least one occasion unrelated to this case, a judge could not be found to issue a warrant. But the evidence also establishes that the officers did not attempt to secure a warrant in this case. Officer Tomlin testified that he took "zero steps" to obtain a warrant to draw McGuire's blood. The State argues that it may have proven difficult to locate a judge to sign a warrant, but, without any effort to do so, the testimony is only speculation.

Having examined the totality of the circumstances, we conclude that the State failed to demonstrate an exigency to excuse the requirement of a warrant.

### d. Whether test results were admissible even though search was unconstitutional

The State offers two arguments why the trial court's ruling on the motion to suppress should be upheld even if the blood draw was unconstitutional: (1) we should apply a "good-faith exception" and uphold the ruling because *McNeely* was decided after the blood draw in this case and the officers were working under the "good-faith" belief that they were authorized to have McGuire's blood drawn without a warrant under the circumstances and (2) admitting evidence of McGuire's blood-alcohol content was harmless error given the other evidence in the record to establish that he was intoxicated.

The State first asks us to create a "good faith exception" to the exclusionary rule because neither *McNeely* nor *Villarreal* had been decided at the time McGuire's blood was drawn. Yet, the State acknowledges that Texas courts "have uniformly rejected a good faith exception." The State asked us to create such an exception in *Tercero,* but we refused to do so. *See Tercero,* 467 S.W.3d at 10–11. We will not depart from our precedent here.

The State next argues that admission of the blood-draw results "was harmless beyond a reasonable doubt" because other evidence tended to show that McGuire was intoxicated that night. But that evidence was contradictory. Some of the officers on the scene testified that McGuire appeared intoxicated, but others testified that he did not. According to the State, McGuire made an "admission" that night on police video that he was intoxicated. The context of that statement was as follows: McGuire told the state trooper that the motorcycle did not have "a single light" on it; the trooper said something to him that cannot be discerned from the audio accompanying the video; McGuire responded, "How is that my fault if the dude jumps out like that and he's not running his lights? ... [inaudible] ... Me being intoxicated was not the issue. You know. It really wasn't. It's unbelievable."

While the State's theory is one possible interpretation of McGuire's statement, it is not the only reasonable one, particularly given that the entire exchange cannot be known due to the audio's poor quality. A reasonable jury could interpret McGuire's statement to mean that whether *or not* he was intoxicated was not the issue and would not have been the cause of the accident because Stidman's motorcycle "jump[ed] out" in front of him without his lights functioning. Because the statement is subject to more than one reasonable interpretation, we do not view it as determinative on whether the error was harmful.

We must reverse a conviction if the appellate record reveals a constitutional error, unless "we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *Holmes v. State,* 323 S.W.3d 163, 173–74 (Tex.Crim.App.2009). We cannot conclude that this evidence was harmless. The jury was informed that McGuire's blood had an alcohol concentration of 0.16 and was instructed that intoxication means "having an alcohol concentration of 0.08 or more." "Given the testimony regarding the taking of appellant's blood sample and his toxicology results and the jury's instruction that intoxicated means, in part, 'having an alcohol concentration of 0.08 or more,' we cannot determine beyond a reasonable doubt that the error did not contribute to [the] conviction." *Perez v. State,*

464 S.W.3d 34, 48 (Tex.App.—Houston [1st Dist.] 2015, pet. ref'd). Moreover, there was testimony from some police officers that McGuire did not appear intoxicated.

Because the blood draw violated the Fourth Amendment and is not otherwise admissible, the trial court erred by denying the motion to suppress.[11]

## D. Venue

McGuire contends that the trial court abused its discretion by denying his venue motion because he established that pretrial publicity was pervasive and unfairly prejudicial.

### 1. Required showing for a change in venue

Every defendant in a criminal case is guaranteed the due process of a fair trial by an impartial jury under the United States and Texas constitutions. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. A change in venue may be granted on a criminal defendant's motion if supported by the defendant's affidavit and the affidavits of two other credible residents of the county if, within the county, there is either (1) "so great a prejudice against [the defendant] that he cannot obtain a fair and impartial trial" or (2) "a dangerous combination against [the defendant] instigated by influential persons, by reason of which he cannot expect a fair trial." TEX. CODE CRIM. PROC. ANN. art. 31.03(a) (West 2006). The movant has the burden to establish either of these bases for a change of venue. See DeBlanc v. State, 799 S.W.2d 701, 704 (Tex.Crim.App.1990).

"Change of venue is a remedy designed to ensure the defendant a fair trial when extensive news coverage has raised substantial doubts about the effectiveness of voir dire for obtaining an impartial jury." Ryser v. State, 453 S.W.3d 17, 33 (Tex.App.—Houston [1st Dist.] 2014, pet. ref'd); see Beets v. State, 767 S.W.2d 711, 742–43 (Tex.Crim.App.1987). To justify a change of venue based on public attention sparked by media, a defendant must show that the "publicity was pervasive, prejudicial, and inflammatory." Gonzalez v. State, 222 S.W.3d 446, 449 (Tex.Crim.App.2007); Salazar v. State, 38 S.W.3d 141, 150 (Tex.Crim.App.2001). "The mere existence of media attention or publicity is not enough, by itself, to merit a change of venue." Gonzalez, 222 S.W.3d at 449; accord Renteria v. State, 206 S.W.3d 689, 709 (Tex.Crim.App.2006). "Even extensive knowledge of the case in the community is not sufficient if there is not a showing of prejudicial or inflammatory coverage." Ryser, 453 S.W.3d at 33; see Gonzalez, 222 S.W.3d at 449. The defendant "bears a heavy burden to prove the existence of such prejudice in the community that the likelihood of obtaining a fair and impartial jury is doubtful." DeBlanc, 799 S.W.2d at 704 (quoting Nethery v. State, 692 S.W.2d 686, 694 (Tex.Crim.App.1985)).

To determine whether the publicity was inflammatory and prejudicial, the court can consider evidence presented at the venue hearing and statements made by veniremembers during voir dire if the trial court rules after the voir dire process. Gonzalez, 222 S.W.3d at 451. Factors a reviewing court may consider when a de-

---

11. The Supreme Court has concluded that even when, like this case, the evidence, if admissible, would clearly establish that the defendant committed the crime, "[t]he criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a govern- ment more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." Mapp v. Ohio, 367 U.S. 643, 659, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961).

fendant appeals the denial of his venue motion include: (1) the nature of the pretrial publicity; (2) the connection of government officials with the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury panel was drawn; and (6) any factors likely to affect the candor and veracity of the prospective jurors during voir dire. *See Gonzalez*, 222 S.W.3d at 448; *Henley v. State*, 576 S.W.2d 66, 71–72 (Tex.Crim. App.1978).

### 2. Standard of review

■ Denial of a change-of-venue request is reviewed for an abuse of discretion. *Gonzalez*, 222 S.W.3d at 449. We give great deference to the trial court, which is in the best position to resolve issues involving conflicts in testimony and to evaluate the credibility of the witnesses. *Id.* at 452; *Brooks*, 323 S.W.3d at 899. If the trial court does not make explicit findings of fact, a reviewing court will assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record. *Montanez v. State*, 195 S.W.3d 101, 106 (Tex.Crim.App.2006); *State v. Ross*, 32 S.W.3d 853, 855 (Tex.Crim.App.2000). As long as the trial court's ruling is within the zone of reasonable disagreement, the trial court does not abuse its discretion in denying the venue motion. *See Gonzalez*, 222 S.W.3d at 449; *Ryser*, 453 S.W.3d at 34.

### 3. Whether trial court abused discretion by denying venue motion

■ McGuire argued in his venue motion that the pretrial publicity was pervasive and unfairly prejudicial. He attached to his venue motion several articles concerning the accident and his criminal prosecution that had been published online and in print. However, he offered no evidence regarding the circulation of these materials. *See Ryser*, 453 S.W.3d at 35 (considering readership of newspapers containing relevant articles and viewership of news programs in evaluating pervasiveness of pretrial publicity); *see also U.S. v. Ricardo*, 619 F.2d 1124, 1132 (5th Cir.1980) (failure to produce newspaper circulation statistics instrumental in court's rejection of appellant's pretrial publicity claims).

At the hearing, McGuire presented three witnesses who all testified that they did not believe he could receive a fair trial in Fort Bend County. All were family friends or relatives. The State countered with two witnesses who testified that McGuire could receive a fair trial in the county. We defer to the trial court's evaluation of these witnesses' credibility and its resolution of this conflicting testimony. *Gonzalez*, 222 S.W.3d at 449.

During voir dire, only five out of 118 veniremembers confirmed that they had previously heard about the case. Of those five, two agreed that they had been influenced by the publicity, and one described what he read as "tragic." The trial court was within its discretion to accept the remaining 113 veniremembers' assurances that they either had not seen publicity about the case or that what they did see would not influence them to such a degree that they could not reach a fair verdict.

With only five veniremembers testifying that they saw publicity out of a panel of 118, McGuire's showing is considerably less than in other cases in which trial courts' rulings to deny venue motions have been affirmed. *See id.* at 450 (discussing standard of review and recounting numerous cases in which denial of venue motion was held to be within trial courts' discretion when as many as one-third of the panel admitted to seeing pretrial publicity); *Von Byrd v. State*, 569 S.W.2d 883, 890–91 (Tex.Crim.App.1978) (concluding trial court did not abuse discretion by de-

nying venue motion when 69 out of 109 panelists saw publicity).

"This court affords great deference to the trial court to determine venue motions." *Ryser*, 453 S.W.3d at 35; *see Gonzalez*, 222 S.W.3d at 452. "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect'...." *Skilling v. United States,* 561 U.S. 358, 386, 130 S.Ct. 2896, 2918, 177 L.Ed.2d 619 (2010) (quoting *Mu'Min v. Virginia,* 500 U.S. 415, 427, 111 S.Ct. 1899, 1906, 114 L.Ed.2d 493). The fact that several veniremembers had heard of the case does not show that the pretrial publicity had permeated the community to such a degree that denial of the venue motion was outside the zone of reasonable disagreement.

We overrule McGuire's venue issue, having concluded that the trial court did not abuse its discretion by denying his venue motion. We note, though, that a new trial could involve new media accounts, and, should the trial court face a venue motion in the future, the trial court's evaluation, at that time, would involve venue facts that are not exactly the same as were presented here.

**E. Cross appeal arising from felony-murder conviction**

■ The State argues on cross-appeal that the trial court erred by adopting McGuire's double-jeopardy argument and instructing the jury that it could not return a conviction on felony murder and intoxication manslaughter.

The court's charge instructed the jury on multiple offenses, including felony murder, intoxication manslaughter, third-offense driving while intoxicated, second-offense driving while intoxicated, and driving while intoxicated. The court instructed

the jury that it "may find the Defendant guilty of only one of the offenses listed above, if he is, in fact, guilty of that offense, or acquit the Defendant of all charges." The jury returned a guilty finding for felony murder. Because of the court's instruction, it is unknown whether the jury also would have determined that all elements were satisfied for McGuire to be found guilty of intoxication manslaughter; by instruction, the jury was not allowed to return more than one guilty finding.

■ "The Double Jeopardy Clause of the Fifth Amendment, applicable to all states through the Fourteenth Amendment, protects an accused against ... multiple punishments for the same offense." *Evans v. State,* 299 S.W.3d 138, 140 (Tex. Crim.App.2009) (citing *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)). The State concedes that punishment for both felony murder and intoxication manslaughter would violate double jeopardy. But it contends that double jeopardy is inapplicable because the State would not have requested the trial court to sentence McGuire for both crimes had the jury convicted him of both. Instead, the State argues that the trial court should have permitted the jury the option to return guilty verdicts on multiple offenses, after which the State would have abandoned the lesser counts.

■ The Supreme Court has held that, "while the Government may seek multiple-count indictments" for crimes that could not be punished together in violation of a criminal defendant's right against double jeopardy,

the accused may not suffer two convictions or sentences on that indictment. If upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he should

instruct the jury as to the elements of each offense. Should the jury return guilty verdicts for each count, however, the district judge should enter judgment on only one of the statutory offenses. *Ball v. United States*, 470 U.S. 856, 865, 105 S.Ct. 1668, 1673–74, 84 L.Ed.2d 740 (1985). Citing *Ball*, the Texas Court of Criminal Appeals has stated that "the State may seek a multiple-count indictment based on violations of different statutes, even when such violations are established by a single act; but the defendant may be convicted and sentenced for only one offense." *Evans*, 299 S.W.3d at 141 (citing *Ball*, 470 U.S. at 865, 105 S.Ct. at 1673–74). If the trial court enters judgments of conviction of two offenses in violation of double jeopardy, the remedy on appeal is to "affirm the conviction for the most serious offense and vacate the other convictions." *Bigon v. State*, 252 S.W.3d 360, 372 (Tex.Crim.App.2008) (affirming conviction for felony murder but vacating conviction for intoxication manslaughter on double-jeopardy grounds).

We conclude that the trial court erred by not allowing the jury to resolve whether McGuire met the elements for conviction on intoxication manslaughter as well as felony murder. Should he be retried and the evidence warrants the submissions, both offenses may be submitted to the jury for determination, though a judgment of conviction may not be entered on both.

The State's cross-appeal issue is sustained.

**F. Disposition of felony-murder appeal**

We have held that the felony-murder indictment was not fundamentally defective but the evidence of McGuire's blood-alcohol level was the result of an unconsti-

tutional, warrantless search. The trial court erred by denying McGuire's motion to suppress that evidence.

We also have held that the trial court did not err by denying McGuire's venue motion based on the venue facts and arguments presented to the trial court preceding McGuire's trial. However, we note that, if another venue motion is urged before a subsequent trial, the analysis may be different, depending on the extensiveness of the publicity and its content.

Finally, we conclude that the trial court erred by instructing the jury that it could not return guilty findings on both felony murder and intoxication manslaughter.

All remaining issues raised in McGuire's appeal of the murder conviction are moot.[12]

### Failure to Stop and Render Aid Conviction

In his appeal of his conviction for failure to stop and render aid, McGuire raises three issues: (1) the trial court abused its discretion by denying his venue motion; (2) the trial court abused its discretion by denying his challenge for cause on a venireperson; and (3) the evidence was legally insufficient to support the jury's verdict of conviction.

**A. Venue**

McGuire argues that the trial court erred by denying his motion to change venue. We have already determined that issue above. McGuire's venue issue is overruled.

**B. Challenge for Cause**

 McGuire next contends that the trial court erred by denying his challenge

12. We do not reach the State's other cross-appeal issue, which challenges the jury instruction with regard to the blood draw. Be-

cause we have concluded that the evidence from the blood draw was inadmissible, this issue is moot.

for cause on "Juror Number One." The State contends that McGuire cannot show the requisite harm to obtain a reversal of his conviction on this basis because McGuire did not use a peremptory strike to remove the objectionable juror. We agree with the State.

■ There are five steps necessary to show harm on a challenge for cause, and McGuire failed to satisfy the second of the five:

> To establish harm for an erroneous denial of a challenge for cause, the defendant must show on the record that "(1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury."

*Comeaux v. State,* 445 S.W.3d 745, 749 (Tex.Crim.App.2014) (quoting *Davis v. State,* 329 S.W.3d 798, 807 (Tex.Crim.App. 2010)). These same basic requirements have existed since 1944. *Johnson v. State,* 43 S.W.3d 1, 5–6 (Tex.Crim.App.2001) (citing *Wolfe v. State,* 147 Tex.Crim. 62, 178 S.W.2d 274 (1944) (op. on reh'g)); *cf. McBean v. State,* 167 S.W.3d 334, 338 (Tex.App.—Amarillo 2004, pet. ref'd) ("The trial court's refusal to excuse a disqualified veniremember pursuant to a challenge for cause is error, but does not necessarily constitute harmful error because a peremptory challenge may be used to strike the disqualified veniremember.").

The juror that McGuire challenged for cause and the trial court refused to excuse was Veniremember One. McGuire did not make his peremptory strikes on the record. It is unclear if McGuire actually used all of his peremptory strikes. While he claimed that he used a strike to remove a different juror and, therefore, was unable to use a strike to remove Veniremember One, the trial judge indicated that McGuire had been given an extra peremptory strike, and the prosecutor discussed that the extra strike was not used. In the end, Veniremember One sat on the jury as Juror Number One.

McGuire did not follow the steps specified in *Comeaux* to show harm from the denial of a challenge for cause. It is not demonstrated in the record that he used all of his peremptory strikes. He clearly did not use a peremptory strike on the juror he now challenges. Without the ability to demonstrate harm from the trial court's ruling, we overrule McGuire's juror challenge issue.

## C. Sufficiency of the evidence

Finally, McGuire argues that he tried to determine what he hit and, after not seeing the motorcycle or its driver, he drove immediately to a nearby gas station and called police acquaintances. He argues that there was legally insufficient evidence to convict him of failing to stop and render aid.

### 1. Standard of review

■ We review a challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia,* 443 U.S. 307, 318–20, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). *See Brooks v. State,* 323 S.W.3d 893, 894–913 (Tex.Crim. App.2010); *Ervin v. State,* 331 S.W.3d 49, 52–56 (Tex.App.—Houston [1st Dist.] 2010, pet. ref'd). Under *Jackson,* insufficient evidence to support a conviction exists if, considering all of the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson,* 443 U.S. at 317–19, 99 S.Ct. at 2788–89; *Laster v. State,* 275 S.W.3d 512, 517 (Tex.Crim.App.2009). We

consider direct evidence, circumstantial evidence, and all reasonable inferences that may be drawn from that evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim.App.2007).

■■■ Evidence is insufficient in the following four cases: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; or (4) the acts alleged do not constitute the criminal offense charged. *See Jackson*, 443 U.S. at 314, 318 & n. 11, 320, 99 S.Ct. at 2786, 2789 & n. 11; *Laster*, 275 S.W.3d at 518; *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007).

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given the witness's testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex.Crim.App.1981); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex.App.—Houston [1st Dist.] 2003, pet. ref'd). The jurors may choose to believe or disbelieve any part of a witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Likewise, "reconciliation of conflicts in the evidence is within the exclusive province of the jury." *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex.Crim.App.2000) (quoting *Losada v. State*, 721 S.W.2d 305, 309 (Tex.Crim.App. 1986)).

■■■ The *Jackson* standard defers to the factfinder's resolution of any conflicts in the testimony, weight of the evidence, and drawing of reasonable inferences from "basic facts to ultimate facts." *Jackson*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89; *Clayton*, 235 S.W.3d at 778. We presume that the factfinder resolved any conflicts in the evidence in favor of the verdict and defer to that resolution, provided it is rational. *See Jackson*, 443 U.S. at 326, 99

S.Ct. at 2793. If we find the evidence insufficient under this standard, we must reverse the judgment and enter an order of acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 41, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982).

### 2. The statute

The Texas "failure to stop and render aid" statute reads:

The operator of a vehicle involved in an accident resulting in injury to or death of a person shall:

(1) immediately stop the vehicle at the scene of the accident or as close to the scene as possible;

(2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident; and

(3) remain at the scene of the accident until the operator complies with the requirements of Section 550.023.

TEX. TRANSP. CODE ANN.§ 550.021(a) (West Supp.2015). The Section 550.023 requirements, referenced in subsection (3) above, are as follows:

The operator of a vehicle involved in an accident resulting in the injury or death of a person or damage to a vehicle that is driven or attended by a person shall:

(1) give the operator's name and address, the registration number of the vehicle the operator was driving, and the name of the operator's motor vehicle liability insurer to any person injured or the operator or occupant of or person attending a vehicle involved in the collision;

(2) if requested and available, show the operator's driver's license to a person described by Subdivision (1); and

(3) provide any person injured in the accident reasonable assistance, in-

cluding transporting or making arrangements for transporting the person to a physician or hospital for medical treatment if it is apparent that treatment is necessary, or if the injured person requests the transportation.

TEX. TRANSP. CODE ANN. § 550.023 (West 2011).

■ Under these statutes, the elements for failure to stop and render aid are that the defendant "(1) [is] a driver of a vehicle (2) involved in an accident (3) resulting in injury or death of any person (4) [and the driver] intentionally and knowingly (5) fails to stop and render reasonable assistance." *Goar v. State,* 68 S.W.3d 269, 272 (Tex.App.—Houston [14th Dist.] 2002, pet. ref'd). No one disputes that McGuire was the driver of a vehicle, that he was involved in an accident, and that the accident resulted in the death of a person. We turn, then, to whether McGuire intentionally and knowingly failed to stop and render reasonable assistance.

### 3. Whether McGuire acted knowingly

■ "The culpable mental state for failure to stop and render aid" is that the defendant "had knowledge of the circumstances surrounding his conduct, meaning the defendant had knowledge that an accident occurred." *Goar,* 68 S.W.3d at 272. The "focus of this offense" is "that an accident" occurred: "a culpable mental state must attach to this circumstance, i.e., whether an accident occurred." *Huffman v. State,* 267 S.W.3d 902, 908 (Tex.Crim. App.2008). The defendant's "failure to stop, return, or remain becomes criminal only because of his knowledge of circumstances surrounding the conduct: an accident and a victim suffering an injury." *Id.* The defendant need not have "positive, subjective knowledge of the nature or ex-

tent of injury resulting from the collision." *Henry v. State,* No. 06–11–00010–CR, 2011 WL 3890736, at *3 (Tex.App.—Texarkana Sept. 6, 2011, no pet.) (mem. op., not designated for publication). Requiring subjective knowledge of the nature or extent of an injury would "defeat the public interest, which is served by requiring drivers involved in collisions to stop, provide specified information, and render assistance if necessary." *McCown v. State,* 192 S.W.3d 158, 162–63 (Tex.App.—Fort Worth 2006, pet. ref'd). If a subjective standard were used, "a callous person might nullify the humanitarian purpose of the statute by the simple act of immediate flight from an accident scene without ascertaining exactly what occurred." *Id.* at 163.

■ Instead, the State satisfies the "intentionally" or "knowingly" elements "if an objective examination of the facts shows that it would be apparent to a reasonable person that someone has been injured in an accident and is in need of reasonable assistance." *Id.* "[C]onstructive knowledge of the resulting injury is sufficient." *Id.* "Intent or knowledge may be inferred from the acts, words, and conduct of an accused at the time of an offense." *Henry,* 2011 WL 3890736, at *3 (internal citations and quote marks omitted).

For example, in *Henry v. State,* the defendant claimed that he did not know that the injured party needed medical attention. *Id.* The court rejected the defendant's argument because the evidence showed that the damage to the injured party's car as a result of the "major accident" was "severe, rendering the car inoperable." *Id.* In addition, Henry's car had "significant damage." *Id.* The officer who arrived on the scene testified that, upon seeing the scene, "[i]t was apparent" that the injured driver needed medical treatment. *Id.* This evidence was sufficient to uphold the jury's guilty verdict. *Id.*

Similarly, in *Goar v. State*, the defendant testified that he "thought he hit a construction barrel" or "a mailbox." 68 S.W.3d at 272. He testified that, after the accident, he parked his car and "walked around for about five to six minutes to see what he hit . . . [and] walked about five feet into the ditch and looked around but did not see the damaged bicycle or [the injured driver's] body." *Id.* at 272–73. Nonetheless, because another driver testified that he saw "a glimmer" of the damaged bicycle and, after stopping his car and looking in the ditch, quickly found the injured driver's body, the State presented sufficient evidence to show that the defendant "failed to stop *or* stopped but failed to render reasonable assistance." *Id.* at 273.

 Similar to the defendant in *Goar* who knew he hit something but claimed that he did not know what he hit, McGuire admitted that he knew that an accident had occurred; he told his friend that he knew he hit "something in the road" and that he "may have messed up bad." He told a second friend that, "I hit something, I don't know what it was, and I don't know what to do." He told an officer that "he hit something, but he didn't know what he hit." Another time, he stated that he hit something or someone. There was also testimony that his wife had told him before he reached the nearby gas station that he hit a person. Yet McGuire did not stop his car or walk around the area to look for what he had hit. Instead, he made a "u-turn" and, after not seeing anything from his driver's seat, turned in at the nearby gas station and called his mother and two police acquaintances.

Although McGuire told those he spoke with that night that he did not see what he hit, three other drivers who were in the area did see the aftermath even without prior knowledge that an accident had just occurred. One driver testified that he saw something on the side of the road and thought it was a dead deer. He turned around and saw that the object "was a body." He testified that there was another driver who parked at the same spot at the same time because he also saw the body on the side of the road. An officer on patrol happened to be driving in the area, saw the motorcycle on the road, and then looked for—and found—Stidman's body.

Considering these facts "in the light most favorable to the verdict," the jury could have concluded that McGuire had constructive knowledge of an injury and, because three people either saw Stidman's body on the side of the road or saw the motorcycle and later found the body, McGuire did not spend a significant amount of time looking for a person injured by the accident he knew had occurred. Thus, we must conclude that there was legally sufficient evidence for a reasonable jury to find that McGuire had the requisite mental state for failing to stop and render aid.

**4. Whether McGuire failed to "stop"**

 A stop under the statute "does not mean a stop for an instant, enabling but a cursory examination of the surroundings" but, instead, requires that the defendant stop "for a sufficient length of time for a person of ordinary powers of observation to fully understand the surroundings of the accident and to possess himself of an accurate knowledge of the results of the accident." *Galvan v. State*, 846 S.W.2d 161, 164 (Tex.App.—Houston [1st Dist.] 1993, no writ) (quoting *Moore v. State*, 140 Tex.Crim. 482, 145 S.W.2d 887, 888 (1940)). If a person "stops as close as possible to the scene and returns to the scene, then he must remain at the scene." *Huffman*, 267 S.W.3d at 909. Such a stop must be of a sufficient length to satisfy the two purposes of the statute: "(1) to pro-

vide for the exchange of information, and (2) to render the statutorily described assistance to injured persons." *Galvan,* 846 S.W.2d at 164. The fact that "the injured person was found to be dead some few minutes after the accident, would not be a sufficient excuse to absolve appellant from blame on account of a failure to stop an appreciable length of time." *Galvan,* 846 S.W.2d at 164 (quoting *Moore,* 145 S.W.2d at 887).

In *Galvan,* the defendant "got out of his disabled car, checked it for damage, started toward the [injured driver who had died on the scene], was stopped by his passenger, and left the scene." *Galvan,* 846 S.W.2d at 164. Although the defendant stopped and got out of his car, the appellate court concluded that there was adequate evidence for the trial court to have concluded that the defendant's conduct "constituted a failure to stop ... for a sufficient length of time ... to fully understand ... [and have] accurate knowledge of the results of the accident." *Id.* (internal quotation marks and citation omitted).

In *Elias v. State,* the defendant left the scene of the accident to go to a convenience store within a half-mile of the accident scene, where his passengers telephoned for aid. 693 S.W.2d 584, 586 (Tex. App.—San Antonio 1985, no pet.). His passengers then returned to the scene without him. *See id.* at 588. The defendant did not make the emergency call or return to the scene; he remained at the convenience store. *Id.* The appellate court rejected the defendant's contentions that the convenient store was close enough to prevent conviction for leaving the scene. *Id.*

■ Although McGuire turned his vehicle around in an apparent attempt to see

what he had hit, he did not stop and, instead, drove directly to a nearby gas station where he waited for his mother and police acquaintances to arrive. McGuire did not know anyone was helping this injured driver. Nor did he use his cell phone to call for emergency medical assistance for the injured driver.[13] Instead, he called only his mother and two police acquaintances. Finally, unlike the defendants in *Galvan* and *Goar,* McGuire did not get out of his car to look for an injured person. Examining these facts in the light most favorable to the jury's verdict, there was legally sufficient evidence that McGuire failed to make a "stop" to meet the requirements of the "failure to render aid" statute.

We, therefore, conclude that the jury was presented with legally sufficient evidence to affirm the conviction.

### Habeas

McGuire obtained habeas relief, arguing that he "has already been convicted of murder for causing the death of David Stidman and is currently charged with Intoxication Manslaughter for causing the death of David Stidman. This is an unconstitutional double jeopardy violation." In the State's appeal of the habeas order dismissing the pending intoxication manslaughter charge, it argues that the "trial court abused its discretion in dismissing [the post-conviction count for intoxication manslaughter] as a double jeopardy violation."

■ "Habeas corpus is by definition an extraordinary writ in which the restraint of one's liberty is challenged as illegal." *Saucedo v. State,* 795 S.W.2d 8, 9 (Tex.App.—Houston [14th Dist.] 1990, no pet.). When "the premise of a habeas

---

**13.** Various police car videos were admitted into evidence. In one of those, McGuire is seen removing a cell phone from his pocket to answer a call.

corpus application is destroyed by subsequent developments, the legal issues raised thereunder are rendered moot." *State v. Golding*, 398 S.W.3d 745, 747 (Tex.App.—Houston [1st Dist.] 2011, pet. ref'd) (quoting *Saucedo*, 795 S.W.2d at 9 and citing *Ex parte Branch*, 553 S.W.2d 380, 381 (Tex.Crim.App.1977)); *see Ex parte Norvell*, 528 S.W.2d 129, 131 (Tex.Crim.App.1975); *Ex parte Horton*, 305 S.W.3d 200, 201 (Tex.App.—Waco 2009, pet. ref'd) (holding that, because defendant's community supervision was revoked, habeas challenge of community supervision was moot). We cannot give any opinion on the merits underlying a moot habeas petition because such an opinion "would be advisory only." *Saucedo*, 795 S.W.2d at 9.

■ Because we reverse McGuire's murder conviction, the underlying basis for his habeas relief—that he is being subjected to trial for intoxication manslaughter after being convicted of murder—is moot. Thus, we must vacate the judgment of the trial court in granting the habeas petition and dismiss McGuire's application for writ of habeas corpus.[14] *See Golding*, 398 S.W.3d at 747.

### Conclusion

We reverse the judgment of conviction for felony murder and remand that cause for proceedings consistent with our opinion. We affirm the conviction for failure to stop and render aid. We vacate the judgment granting habeas relief and dismiss the application for writ of habeas corpus.

14. Because we dismiss McGuire's habeas petition as moot, we do not reach the question of whether McGuire invited error and is thereby precluded from seeking habeas relief.