

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00087-CR

DANIELLE BROOK-LYNN FAULKNER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 19-0425X

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

A Harrison County jury found Danielle Brook-Lynn Faulkner guilty of injury to a child by omission, and the trial court sentenced her to forty-five years in prison. On appeal, Faulkner argues (1) that the evidence was legally insufficient to support the jury's verdict because the State failed to prove an omission by her and (2) that the trial court erred by denying her motion for a mistrial.

We affirm the trial court's judgment because (1) the evidence was sufficient to support the jury's finding of an omission, and (2) the trial court did not err by denying Faulkner's motion for mistrial because her objection was untimely.

## I.        Factual and Legal Background

Faulkner is the mother of S.H., a five-year-old boy, and L.H., his three-year-old brother. They lived together with Faulkner's boyfriend, Larry Prudhomme, in Waskom, Harrison County, Texas. At 2:00 p.m., on September 18, 2019, Faulkner went to work at a local service station, and she took both children with her. At about 7:00 p.m., Prudhomme picked up the children and took them home. While she was at work, Prudhomme called her and "casually" told her that S.H. had tripped and fallen off the porch, that he was fine, that he had eaten dinner, and that, after S.H. took a bath, he was going to bed. Faulkner returned home from work around midnight, and she checked on S.H. She saw that S.H. was on his bed sleeping. However, Faulkner noticed that S.H. was gritting his teeth, that his breathing was odd and labored, and that his hands were drawn up to his chest. She lifted his shirt, but she did not see anything that "stood out" to her. When she was unable to wake S.H., she screamed for someone to call 9-1-1.

Prudhomme called 9-1-1, and emergency responders found S.H. nonresponsive. S.H.'s breathing was abnormal, he had bruises on his head, his right eye was "swollen shut," and he had severe bruising on his chest, back, buttocks, and legs. The bruises were in various stages of healing. S.H. was also "posturing," an involuntarily flexing of the arm muscles "indicative of a brain injury." S.H. was taken to a Shreveport hospital, but he died two days later as a result of traumatic brain injury resulting from blunt force trauma. The autopsy determined that the manner of death was homicide.

Despite Prudhomme's contentions that S.H. was injured when he fell off the porch, he later pled guilty to S.H.'s murder and was sentenced to fifty years in prison. Faulkner was charged with injury to a child by omission, with the State alleging that she ignored Prudhomme's prior abuse of S.H. Here, the amended indictment[1] alleged that Faulkner:

> did then and there, intentionally and knowingly, by omission, cause serious bodily injury to S.H . . . a child 14 years of age or younger, by leaving S.H. in the care, custody, or control of Larry Prudhomme, a man who the defendant knew had previously caused injury to S.H. and the defendant had a legal duty to act, namely as parent of S.H.

Faulkner entered a plea of "not guilty." A Harrison County jury found her guilty as charged. After a trial on punishment, Faulkner was sentenced to forty-five years in prison.

## II. Sufficiency of the Evidence

In her first point of error, Faulkner argues that there was legally "insufficient evidence of any omission by [her]."

---

[1]Faulkner did not file a motion to quash the indictment.

The Texas Penal Code distinguishes between acts and omissions: an "[a]ct" is a "bodily movement," TEX. PENAL CODE ANN. § 1.07(a)(1) (noting that "[a]ct . . . includes speech"), while an "[o]mission" is the "failure to act," TEX. PENAL CODE ANN. § 1.07(a)(34). But the distinction between acts and omissions is not always black and white; although an omission is, by definition, the opposite of an act, an allegation that a defendant failed to do something does not mean that the defendant may not also commit an act during the course of her omission. *McGuire v. State*, 493 S.W.3d 177, 188–90 (Tex. App.—Houston [1st Dist.] 2016, pets. ref'd); *see also Hill v. State*, 881 S.W.2d 897, 902–03 (Tex. App.—Fort Worth 1994) (recognizing that there was evidence of both affirmative acts and omissions), *aff'd*, 913 S.W.2d 581 (Tex. Crim. App. 1996).

In contrast to the majority of crimes that proscribe an action, an omission is punished only when there is "a corresponding duty to act." *Billingslea v. State*, 780 S.W.2d 271, 274 (Tex. Crim. App. 1989); *see Florio v. State*, 784 S.W.2d 415 (Tex. Crim. App. 1990). Chapter 6 of the Texas Penal Code generally denounces criminal omissions, permitting them only where "a law . . . provides that the omission is an offense or otherwise provides that [an individual] has a duty to perform the act." TEX. PENAL CODE ANN. § 6.01(c). Section 22.04 of the Texas Penal Code is one of those provisions. By its terms, Section 22.04 punishes an individual who "intentionally, knowingly, or recklessly by omission, causes to a child . . . serious bodily injury." TEX. PENAL CODE ANN. § 22.04(a) (Supp.). Injury-to-a-child offenses under Section 22.04 are "result-oriented" and "requir[e] a mental state that relates not to the specific conduct but to the

4

result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985)).

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"The jury is free to believe or disbelieve the testimony of any witness, to reconcile conflicts in the testimony, and to accept or reject any or all of the evidence of either side." *Bottenfield v. State*, 77 S.W.3d 349, 355 (Tex. App.—Fort Worth 2002, pet. ref'd). We may not substitute our own determination for that of the jury, and it is not proper for us to do so. *See Ortiz v. State*, 93 S.W.3d 79, 87–88 (Tex. Crim. App. 2002); *Scott v. State*, 934 S.W.2d 396, 399 (Tex. App.—Dallas 1996, no pet.). A jury confronted with conflicting evidence may elect to

believe one witness and disbelieve others; it may resolve inconsistencies in the testimony of any witness, even to the extent of accepting the testimony of lay persons that disputes that of experts. *See Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Williamson*, 589 S.W.3d at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Section 22.04 of the Texas Penal Code defines the offense of injury to a child. TEX. PENAL CODE ANN. § 22.04(a). It provides, in relevant part, that a person commits an offense if he intentionally or knowingly, by act or omission, causes bodily injury to a child. *Id.* An omission that causes injury to a child is conduct constituting an offense if the person has care, custody, and control of the child or a legal or statutory duty to act. TEX. PENAL CODE ANN. § 22.04(b). Therefore, under the hypothetically correct jury charge, the State was required to prove that Faulkner intentionally and knowingly, by omission, caused serious bodily injury to S.H. and that Faulkner, as S.H.'s parent, had a legal or statutory duty to protect S.H. from harm. *See* TEX. PENAL CODE ANN. § 22.04(a), (b). It is undisputed that Faulkner had a duty to protect

S.H. because he was her child.[2]  *See* TEX. FAM. CODE ANN. § 151.001(a)(2).  Faulkner concedes that she left S.H. in Prudhomme's care and custody and that her doing so "resulted in injury" to S.H.  Faulkner does not challenge the sufficiency of the evidence to support the jury's findings as to mens rea, causation, or serious bodily injury.  Faulkner's sole argument is that "there was no evidence of any omission by [her]."

During the police interviews with her, Faulkner said that, when she worked, the children were either with her at her job or they were with Prudhomme who watched them at their home. She said that S.H. often got in trouble when he was left alone with Prudhomme and that Prudhomme spanked S.H. about four days a week.  Prudhomme had told Faulkner that five-year-old S.H. was trying to split up their relationship, and S.H. told Faulkner that he thought Prudhomme did not love him.

Dr. Kevin Boykin testified that, when S.H. was brought to the hospital on the day of the incident, he had the most bruises he had ever seen on one child, that his bruises were "associated more often with child abuse or intentional injury," and that S.H.'s injuries were the result of a "pattern" of "beating[s]" over a period of time rather than a single isolated event.  The autopsy determined that S.H. was severely bruised all over his body, and while some of his bruises were one to two days old, others were three or four days old.  The autopsy also revealed that S.H. had suffered both a recent and an older head injury resulting in two different subdural hematomas and that he had a fractured rib that was "probably at least two weeks old."

---

[2]The jury was instructed that the parent of a child had the statutory duty "of care, control, protection, and reasonable discipline of the child" and "to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education."

7

Faulkner admitted that S.H. often had bruises, but she claimed that he fell down a lot because he was "clumsy." Faulkner admitted that Prudhomme had to have been abusing S.H., but she claimed that she did not know about the abuse. However, there was evidence from which a jury could have inferred that Faulkner knew of the abuse and left S.H. in Prudhomme's care anyway.

About two weeks before the events in this case, Prudhomme called Faulkner at work and told her that S.H. was throwing up. S.H. spent several days in bed. He had some bruises on his head, he was vomiting and sensitive to light, and he told Faulkner that his head hurt. Faulkner used her cell phone to search the internet regarding vomiting, light sensitivity, and head injuries. During one of her interviews, she claimed that she believed S.H. was sick with the flu and that she did not take him to the doctor because he had stopped vomiting and had gotten better in a few days. Faulkner admitted that she noticed that S.H. started bruising easily after this "flu," but she thought he had a vitamin deficiency.

On one occasion before the incident, S.H. had gotten in trouble at home while Faulkner was at work. After Faulkner got home, Prudhomme insisted that Faulkner spank the child, but when he deemed her spanking insufficient, he spanked S.H. again with a belt. Faulkner said that Prudhomme used "enough [force] that she didn't want [Prudhomme] around [S.H.] anymore." Faulkner took S.H. to his room, Prudhomme flipped the coffee table over, and then they argued about discipline.

On the day of the incident, S.H. had a swollen black eye that had occurred a few days earlier while Faulkner was at work and Prudhomme was watching the children. Prudhomme told

8

Faulkner that S.H. had run into the truck door, but Faulkner agreed that the injury did not look like the child had run into a truck door.

Faulkner helped S.H. get dressed the day the incident occurred, as well as the two previous days. The day of the incident, she helped S.H. put his shirt on, and she claimed that he had only a "couple" of small bruises on his chest. When she asked him about them, S.H. told her that he fell. She claimed that she did not see any bruises on his back and that she never saw S.H. with severe bruising. However, as the trier of fact, the jury was free to disbelieve her testimony. *See Bottenfield*, 77 S.W.3d at 355.

Faulkner spoke with some of her family members about the bruises on S.H.'s forehead and about Prudhomme's excessive punishments. She admitted that she was increasingly nervous about leaving the children alone with Prudhomme and that she tried to keep Prudhomme and S.H. from being alone together. A few months before S.H.'s death, Faulkner became so concerned for the children that she took S.H. and his brother to live with her mother in Texas City for about a month. She denied knowing that Prudhomme was abusing S.H., but she admitted that she "kind of had an idea that it . . . was headed that way." She admitted that she "should've known" and that she was angry at herself because she "didn't see it" and she "ignored it."

The evidence indicated that Prudhomme had been physically abusing S.H., and from Faulkner's statements, as well as the nature and age of S.H.'s injuries, the jury could have inferred that Faulkner knew Prudhomme was abusing the child and that she left the child in Prudhomme's custody and control anyway. Viewing the evidence in the light most favorable to

9

the verdict, as we must, the jury could have reasonably determined (1) that, by leaving S.H. with Prudhomme on the day of the incident, Faulkner failed to fulfill her duty to protect the child and (2) that that omission caused the child serious bodily injury. *See McGuire*, 493 S.W.3d at 188–90. Having found legally sufficient evidence of an omission by Faulkner, we overrule this point of error.

### III.    Motion for a Mistrial

In her final point of error, Faulkner contends than the trial court erred by not granting her motion for a mistrial.

Lieutenant Mack Fuller of the Harris County Sheriff's Office testified that he had interviewed Faulkner with her attorney present to prepare for her testimony at Prudhomme's trial. The State offered a recording of the interview into evidence as Exhibit 48. The court asked Faulkner if she had any objection to Exhibit 48, and she said, "No." Exhibit 48 was published to the jury, which watched about half of the nearly two-hour recording before the trial court recessed for the day. No objections were made while the recording was played for the jury. When the trial resumed the next morning, a further portion of the recording was played for the jury. At some point during that portion of the publication, Faulkner objected and moved for a mistrial because the recording showed privileged discussions between Faulkner and her counsel, wherein counsel accused her of not being honest with the police and instructed her as to what to say to support her defense.[3]   Faulkner contended that a mistrial was warranted because the

---

[3]Faulkner's counsel explained that:

> basically what the jury has just seen is I'm ripping [Faulkner] a new one because we are on this video. . . .

10

playing of Exhibit 48 "caused an incurable error" as it showed Faulkner's counsel "basically accusing [his] own client of not being truthful." The trial court denied the motion but admonished the jury to disregard any comments that counsel made to Faulkner during the interview. Despite the curative instruction, Faulkner renewed her motion for a mistrial, which the trial court denied.

To preserve error for review, a party must make "a timely request, objection or motion." TEX. R. APP. P. 33.1(a)(1). "To be timely, the objection must be made at the earliest opportunity." *Baum v. State*, No. 07-10-00166-CR, 2011 WL 13506, at *1 (Tex. App.—Amarillo 2011, pet. ref'd) (mem. op., not designated for publication); *see Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006) (stating that an objection is timely if made as "soon as the grounds for it become apparent"). When a party affirmatively states he has "no objection" when evidence is offered, any complaint is waived. *See Holmes v. State*, 248 S.W.3d 194, 196 (Tex. Crim. App. 2008); *Moraguez v. State*, 701 S.W.2d 902, 904 (Tex. Crim. App. 1986); *accord Tex. Dep't of Transp. v. Pate*, 170 S.W.3d 840, 850 (Tex. App.—Texarkana 2005, pet. denied). Moreover, "[t]he law of invited error provides that a party cannot take advantage of an error that it . . . caused, even if such error [was] fundamental"; "a party is estopped from seeking appellate relief based on error that [is] induced." *Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011).

---

It's my job to make sure my client's telling the truth to help in the prosecution of [the Prudhomme] case, and now we've played this tape in front of a jury of 12 people and two alternates where I'm basically accusing my own client of not being truthful.

Here, Faulkner stated that she had no objection to the admission and publication of Exhibit 48. After it had been admitted and most of the video had been published to the jury, Faulkner objected. However, at that point, the objection was not timely, and she is estopped from seeking appellate relief regarding the exhibit. Accordingly, we overrule this point of error and affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted:     January 11, 2023
Date Decided:     March 8, 2023

Do Not Publish