

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00140-CR

_____

MIGEL JULIANNA MATTHEW, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. DC78-CR2020-0414

---

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

After a morning spent drinking alcohol, Appellant Migel Julianna Matthew drove her friend, Tyneshia Chatman, to pick up Chatman's children from school. While driving from the school to her apartment—with Chatman and five of Chatman's children in tow—Matthew lost control of her vehicle, which rolled over and ejected its occupants. One of Chatman's children—four-year-old Christian Redmond—died at the scene. A jury later convicted Matthew of felony murder and assessed her punishment at sixty years' confinement; the trial court sentenced her accordingly. *See* Tex. Penal Code Ann. § 19.02(b)(3). In three issues on appeal, Matthew raises two complaints of jury-charge error and one complaint relating to the admission of a Crash Data Retrieval report generated from Matthew's vehicle. Because we find no jury-charge error and because Matthew did not preserve her complaint regarding the admission of the Crash Data Retrieval report, we will affirm.

## II. BACKGROUND

### A. Matthew Purchases Alcohol, Proceeds to Drink Alcohol, and Drives to a School Where She Picks Up Chatman's Children, Including Christian

At around 10:30 a.m. on December 20, 2019, Matthew entered a liquor store in Wichita Falls and purchased a pint[1] of Hennessy cognac and a Smirnoff Ice

---

[1]At trial, testimony was presented that a 375-milliliter bottle of liquor is commonly called a "pint," even though a pint technically holds approximately 473 milliliters.

2

Screwdriver. Matthew then went to Chatman's house and started drinking.[2] Around 1:00 p.m., Matthew drove Chatman, along with two of Chatman's children who were not in school that day, to an elementary school to pick up three of Chatman's other children, including Christian.[3] While parked at the school, Chatman got out of the vehicle to pick up her children while Matthew remained inside the vehicle. A witness who was picking up his nephew from the school at the same time observed that Matthew was "slumped over the center console" of the vehicle and remained "slumped over" until Chatman returned with the children and "motioned for her to get up."

## B. Matthew Drives from the School Toward Her Apartment, She Loses Control of the Vehicle While Traveling at a High Rate of Speed, the Vehicle Rolls Over and the Occupants are Ejected, and Christian Dies at the Scene

Matthew then drove the vehicle toward her apartment where she planned to meet her daughter who was being dropped off from school at the apartment.[4] None of the vehicle's occupants were wearing a seatbelt—except perhaps one of Christian's

---

[2]Matthew would later explain that she and Chatman had been drinking on the day of the crash to celebrate the milestone that their respective children had completed another semester of school. Matthew indicated that she had no intention of getting "drunk" but that she had just wanted to "enjoy" herself.

[3]Christian was enrolled in a preschool program at the school. At trial, the principal of the school explained that the day of the crash was the Friday before Christmas break and that classes had gotten out early that day.

[4]Matthew's daughter went to a different school than Chatman's children.

3

brothers[5]—and none of the children were in a car seat or booster seat. As she headed toward her apartment, Matthew drove on a ramp to get from State Highway 281 onto Southwest Parkway, where she encountered a curve in the road. The speed limit on the straightaway portion of that road was sixty miles per hour, while the speed limit around the curve was fifty-five miles per hour. A witness who was driving on the same road at the same time noted that Matthew's "car [was] flying" and that it was "hauling a[**]."[6] Despite warnings from Chatman and some of the children to slow down, Matthew "didn't listen." As Matthew encountered the curve in the road, she lost control of her vehicle. The vehicle then left the roadway and overturned several times. All of the vehicle's occupants were ejected. Christian died at the scene due to blunt-force trauma.

## C. Officers Respond to the Crash and Find Evidence Indicating that Matthew was Driving While Intoxicated (DWI)

Police arrived at the scene of the crash shortly before 1:30 p.m., and paramedics arrived soon after. Officers noticed an odor of alcohol coming from

---

[5]Several witnesses indicated that none of the vehicle's occupants were wearing seatbelts. One of Christian's brothers, however, testified that he was wearing a seatbelt at the time of the crash, although he stated that none of the other occupants, including Christian, were wearing a seatbelt. Despite purportedly wearing a seatbelt, that same brother indicated that he had been ejected from the vehicle following the crash.

[6]The witness stated that Matthew's vehicle was traveling "at least 70." He also stated that he "couldn't really . . . say what the speed [of Matthew's vehicle] was, but [he] knew it was a lot faster than what the speed limit was."

4

Matthew and coming from the interior of her vehicle. Matthew told officers that she had swerved her vehicle to avoid hitting a tire in the road. Officers, however, did not find a tire or any similar obstruction in the road. They did, however, find numerous unopened and opened alcoholic beverages in the debris field, including an empty pint of Hennessy. Officers indicated that Matthew was crying and emotionally distraught at the scene, and Chatman seemed in shock, as she kept saying, "I told her to slow down. I told her to slow down."

**D. Matthew is Taken to a Hospital Where Her Blood is Drawn, the Draws Reflect Blood Alcohol Concentrations Exceeding the Legal Limit, and Matthew is Arrested**

After the crash, Matthew was taken to a hospital. The hospital drew her blood at 2:59 p.m.—approximately an hour-and-a-half after the crash—and a later conversion of the serum panel from that draw into a whole blood value revealed a blood alcohol concentration of 0.188—over twice the legal limit. *See* Tex. Penal Code Ann. § 49.01(2)(B). A police officer interviewed Matthew at the hospital, where he noted that her speech was slurred and that her eyes were bloodshot. During one part of that interview, Matthew indicated that she had taken "three drinks" of Hennessy mixed with Coca-Cola, while during a later part of the interview Matthew indicated that she had drunk "two shots" of Hennessy mixed with Coca-Cola. Following that interview, Matthew consented to a second blood draw. The second blood draw was taken around 4:40 p.m.—approximately three hours and ten minutes after the crash—and it revealed a blood alcohol concentration of 0.155. Pursuant to a warrant, a third

blood draw was taken at 5:15 p.m.—approximately three hours and forty-five minutes after the crash—and it revealed a blood alcohol concentration of 0.147. Matthew was placed under arrest at the hospital. When placed under arrest, Matthew stated, "Why am I going to jail? I only had a few shots of Hennessy."

### E. Matthew is Indicted for Felony Murder

Matthew was later indicted for felony murder. *See* Tex. Penal Code Ann. § 19.02(b)(3). The indictment alleged that she had committed an act that was clearly dangerous to human life—namely speeding and/or failing to maintain a safe speed for the roadway and/or dangerously exceeding the speed limit for the roadway and/or traveling at such a high rate of speed for the roadway that she could not maintain safe control over the vehicle and/or failing to keep a proper lookout and/or failing to keep the vehicle on the roadway and/or driving while intoxicated with a child passenger—that she had committed the felony of driving while intoxicated with a child passenger, and that the child's death had been caused while Matthew was in the course of and in furtherance of that felony.

### F. Matthew's Trial

Matthew's case proceeded to a jury trial in April 2022. The jury heard from numerous witnesses, including the witness who saw Matthew "slumped over" in the school parking lot, the witness who testified that Matthew's "car [was] flying" and that it was "hauling a[**]," law enforcement officers who responded to the crash scene and

met with Matthew at the hospital, hospital personnel who took the blood draws, and several of the children who had been in the crash.

The jury also heard from Troy Walden, the Director of the Center of Alcohol and Drug Education Studies program at the Texas A&M Transportation Institute, who testified regarding Matthew's level of intoxication. Walden testified about the three blood draws taken from Matthew and about the levels of blood alcohol concentration reflected in those draws. Extrapolating from the draws, Walden estimated that at the time of the crash, Matthew's blood alcohol concentration was "somewhere in the range of about a .199." Walden opined that an individual with that level of blood alcohol concentration would not be able to operate a vehicle safely, noting that the individual's ability to process information critical to the safe operation of the vehicle would be impaired.

The jury also heard from Justin Burger, a state trooper with the Texas Department of Public Safety, who testified regarding the collection of data obtained from the airbag control module of Matthew's vehicle. During his testimony, the State offered a Crash Data Retrieval report generated from that data. Over Matthew's objection to the reliability of the report, the trial court admitted it. Later in the trial, James Evans, a licensed professional engineer working in accident reconstruction, testified regarding the data from the Crash Data Retrieval report. Evans stated that the data indicated that Matthew's vehicle had been traveling at 103 miles per hour five

seconds before the crash, 103 miles per hour four seconds before the crash,[7] and ninety-five miles per hour three seconds before the crash. Independent of the data from the Crash Data Retrieval report, Evans opined that, based on other evidence he reviewed from the crash, Matthew's vehicle was traveling at a range of eighty to one hundred miles per hour in the moments leading up to the crash.

Finally, the jury heard audio from a jailhouse call made by Matthew. During that call, Matthew indicated that she had drunk "a fifth"[8] of Hennessy in the past and "never got f[***]ed up." Matthew then stated that she had drunk a pint of Hennessy on the day of the crash but that she was not "f[***]ed up." Matthew also indicated that she had been speeding on the day of the crash to get to her child.

Before closing arguments, the trial court held a charge conference. Neither side objected to the charge, and Matthew's counsel stated that the charge was "in the appropriate form." The jury later convicted Matthew of felony murder and found that she had used a deadly weapon, her vehicle, during the offense. The jury assessed Matthew's punishment at sixty years' confinement, and the trial court sentenced her

---

[7]Evans testified that the "engine RPM [had] changed slightly" between the four-second mark and the five-second mark but that the speed of Matthew's vehicle was "still closer to 103."

[8]Testimony was presented at trial that a "fifth" of liquor contains approximately 750 milliliters.

8

accordingly. Matthew filed a motion for new trial that was denied by the trial court.[9]

This appeal followed.

## III. DISCUSSION

### A. Matthew's Jury-Charge Complaints

In her first two issues, Matthew argues that there was error in the trial court's jury charge.

#### 1. Standard of Review

Article 36.14 of the Texas Code of Criminal Procedure requires the trial court to instruct the jury on the law applicable to the case. Tex. Code Crim. Proc. Ann. art. 36.14. Thus, the trial judge is responsible for the accuracy of the charge and accompanying instructions. *Bell v. State*, 635 S.W.3d 641, 645 (Tex. Crim. App. 2021). If the trial court fails to set forth the correct law applicable to the case, jury-charge error results. *Id.*

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *Id.*

---

[9]In her motion for new trial, Matthew complained that there was error in the jury charge; that the verdict, judgment, and sentence were contrary to the law and the evidence; and that a new trial should be granted in the "interest of justice."

### 2. Matthew's Complaint That the Trial Court Erred by Allegedly Instructing the Jury that It Could Return a Finding of Guilt Based Upon an Omission Rather Than an Act

In her first issue, Matthew argues that the trial court erred by allegedly instructing the jury that it could return a finding of guilt on felony murder based upon an omission rather than an act.

#### a. Applicable Law

Under Texas law, a person commits felony murder if she "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt . . . [s]he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(3). Thus, a conviction for the offense of felony murder must be based on an act that causes death, not merely on an omission that causes death. *See Rodriguez v. State*, 454 S.W.3d 503, 507–08 (Tex. Crim. App. 2014). The Texas Penal Code defines an "[a]ct" as "a bodily movement, whether voluntary or involuntary, and includes speech," while it defines an "[o]mission" as the "failure to act." Tex. Penal Code Ann. § 1.07(a)(1), (34).

"[T]he distinction between acts and omissions is not always black and white." *Thetford v. State*, 643 S.W.3d 441, 444 (Tex. App.—Fort Worth 2022, pet. ref'd). "[A]lthough an omission is, by definition, the opposite of an act, an allegation that a defendant failed to do something 'does not mean that [the] defendant . . . may not also engage in some type of act during the course of that omission.'" *Id.* (quoting

10

*McGuire v. State*, 493 S.W.3d 177, 188 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd)). Indeed, there is no "per se rule prohibiting the State from using a failure-alleging indictment to charge or convict a defendant of an act-based offense." *Id.* at 447. When the State uses such a failure-alleging indictment, the proper question is whether the evidence shows the commission of an act. *Id.* at 448.

### b. The Complained-Of Paragraph in the Charge

Matthew points to the following application paragraph in the jury charge to support her contention that the trial court authorized a finding of guilt based upon an omission rather than an act:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 20th day of December 2019, in Wichita County, Texas, the defendant, Migel Julianna Matthew, did then and there commit an act clearly dangerous to human life, namely speeding and/or failing to maintain a safe speed for the roadway and/or dangerously exceeding the speed limit for the roadway and/or traveling at such a high rate of speed for the roadway that she could not maintain safe control over the vehicle and/or failing to keep a proper lookout and/or failing to keep the vehicle on the roadway and/or driving while intoxicated with a child passenger, that caused the death of Christian Redmond, a child younger than 15, and the defendant was then and there in the course of committing a felony, namely driving while intoxicated with a child passenger, and the death of Christian Redmond was caused while the defendant was in the course of and in furtherance of the commission of the felony, then you will find the defendant, Migel Julianna Matthew, guilty of murder, and so say by your verdict.

11

### c. Analysis

Matthew contends that six of the seven alternative acts in the application paragraph are not acts but rather are omissions.[10] Thus, Matthew contends that the application paragraph is fundamentally defective because at least one of the alternative theories contained in the paragraph was not an offense at all. *See Mitchell v. State*, 572 S.W.3d 303, 307 (Tex. App.—Texarkana 2019, no pet.) ("A charge allowing the jury to convict under alternative theories is defective if one of the theories is legally invalid."). The State counters that all of the disputed alternative acts in the application paragraph properly authorized the jury to convict Matthew based on acts that were clearly dangerous to human life. We now turn to each of the six disputed alternative acts.

First, we address the alternative acts of "dangerously exceeding the speed limit for the roadway" and "traveling at such a high rate of speed for the roadway that [Matthew] could not maintain safe control over the vehicle." With scant analysis and citing to no authority, Matthew suggests that "'dangerously exceeding the speed limit' and 'traveling at a high rate of speed,' etc., appear to be neither acts nor omissions." We disagree. Both of those alternative acts—at their heart—involve speeding, an alternative act that Matthew does not challenge on appeal. Speeding—at least in the circumstances presented here—necessarily involves a bodily movement by the driver,

---

[10]Matthew does not challenge that "speeding" is an act.

12

namely, pressing down on the accelerator to propel the vehicle forward. *See Dittman v. State*, No. 05-11-00345-CR, 2012 WL 3139873, at *3 (Tex. App.—Dallas Aug. 3, 2012, pet. ref'd) (not designated for publication) ("[T]he jury could have found that appellant's acts of speeding and making an unsafe lane change were committed in furtherance of felony DWI."). Thus, we reject Matthew's contention that these alternative acts were not acts.

Next, we address the alternative act of "driving while intoxicated with a child passenger." The "voluntary act of driving after consuming alcohol [can] be . . . an act clearly dangerous to human life." *McGuire*, 493 S.W.3d at 190. Moreover, a felony-murder conviction can be based upon the underlying felony without proof of any dangerous act beyond that covered by the underlying felony. *Johnson v. State*, 4 S.W.3d 254, 255–58 (Tex. Crim. App. 1999). Here, Matthew's act of driving after consuming alcohol involved several bodily acts, namely, drinking excessive amounts of alcohol and then driving a vehicle with children inside it while impaired by the alcohol. Thus, we reject Matthew's contention that this alternative act was not an act.

Finally, we address the alternative acts of "failing to maintain a safe speed for the roadway," "failing to keep a proper lookout," and "failing to keep the vehicle on the roadway." Matthew contends that these three alternative acts are "clearly 'omissions,'" noting that they emphasize a "*failure* to act." We disagree. As noted above, an allegation that a defendant failed to do something does not mean that the defendant may not also engage in some type of act during the course of that omission.

13

*Thetford*, 643 S.W.3d at 444; *McGuire*, 493 S.W.3d at 188. Here, the allegation that Matthew failed to maintain a safe speed implicates the act of speeding discussed above that necessarily involves a bodily movement by the driver. *See Carter v. State*, No. 01-07-00301-CR, 2008 WL 5177903, at *3–5 (Tex. App.—Houston [1st Dist.] Dec. 1, 2008, pet. struck) (mem. op., not designated for publication) (affirming felony-murder conviction based on acts clearly dangerous to human life in course of felony DWI that included as an alternative act "failing to control his speed").

The allegation that Matthew failed to keep a proper lookout also meets the criteria of an act where the accident took place around a curve at a speed far exceeding the speed limit for the curve. *See Cantu v. State*, No. 04-20-00096-CR, 2021 WL 3639812, at *3 (Tex. App.—San Antonio Aug. 18, 2021, no pet.) (mem. op., not designated for publication) (holding that "failing to keep a proper lookout," as alleged in the indictment, "met the criteria for an affirmative voluntary act"); *McGuire*, 493 S.W.3d at 190 ("[T]he indictment could have alleged that McGuire failed to maintain a proper lookout because he was texting or looking at the floorboard for something he had dropped. These clearly would be acts."); *Carter*, 2008 WL 5177903, at *3–5 (affirming felony-murder conviction based on acts clearly dangerous to human life in course of felony DWI that included as an alternative act "failing to maintain a proper lookout"). The allegation that Matthew failed to keep the vehicle on the roadway similarly involved bodily movement on Matthew's part—namely, turning the steering wheel. Matthew claimed to swerve because she thought she saw

14

an obstruction in the roadway, an obstruction that was not there. *See Carter*, 2008 WL 5177903, at *3–5 (affirming felony-murder conviction based on acts clearly dangerous to human life in course of felony DWI that included as an alternative act "failing to maintain a single lane of traffic"). Thus, we reject Matthew's contention that these alternative allegations were not acts.

Having found no jury-charge error with respect to this complaint, we overrule Matthew's first issue.

### 3. Matthew's Complaint That the Trial Court Erroneously Instructed the Jury That Texas's Felony-Murder Statute Does Not Require Proof of a Culpable Mental State

In her second issue, Matthew argues that the trial court erroneously instructed the jury that Texas's felony-murder statute does not require proof of a culpable mental state. Matthew cites *Womble v. State*, 618 S.W.2d 59 (Tex. Crim. App. [Panel Op.] 1981) for the proposition that Texas's felony-murder statute requires proof of a culpable mental state. In *Womble*, the Texas Court of Criminal Appeals interpreted the predecessor statute to Texas Penal Code Section 19.01[11] as "plainly mandat[ing] that one of the four mental states is required to any offense of criminal homicide."[12] *Id.* at 64. According to Matthew, *Womble*, when read in conjunction with the "clear

[11]Section 19.01(a) provides that "[a] person commits criminal homicide if [s]he intentionally, knowingly, recklessly, or with criminal negligence causes the death of an individual." Tex. Penal Code Ann. § 19.01(a).

[12]Section 19.01(b) defines "[c]riminal homicide" as "murder, capital murder, manslaughter, or criminally negligent homicide." Tex. Penal Code Ann. § 19.01(b).

legislative intent" of Texas Penal Code Sections 6.02(b)[13] and 19.01, requires proof of a culpable mental state to support a conviction for felony murder.

In two more recent cases—*Lomax v. State*, 233 S.W.3d 302 (Tex. Crim. App. 2007) and *Bigon v. State*, 252 S.W.3d 360 (Tex. Crim. App. 2008)—the Texas Court of Criminal Appeals rejected this very argument.

In *Lomax*, the appellant was charged with felony murder based on a felony DWI, and he claimed—just as Matthew claims here—that the felony-murder statute requires proof of a culpable mental state. 233 S.W.3d at 304. In rejecting that argument, the Texas Court of Criminal Appeals held that "Section 19.02(b)(3) plainly dispenses with a culpable mental state." *Id.* at 305. The court reasoned that "deciding that Section 19.02(b)(3) dispenses with a culpable mental state is consistent with the historical purpose of the felony-murder rule, the very essence of which is to make a person guilty of an 'unintentional' murder when [s]he causes another person's death during the commission of some type of felony." *Id.*

In *Bigon*, the Texas Court of Criminal Appeals again upheld a felony-murder conviction where the underlying felony was a DWI. 252 S.W.3d at 360. The court reaffirmed *Lomax*, stating,

---

[13]Section 6.02(b) provides that "[i]f the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element." Tex. Penal Code Ann. § 6.02(b).

16

> Appellant argues that the State failed to allege a culpable mental state for felony murder, and the court of appeals erred in its decision that the trial court did not err in refusing to quash the indictments. He contends that it goes against the intent of the Legislature to say that a felony that expressly has no culpable mental state may serve as the underlying felony in a felony[-]murder conviction. This Court has already addressed this issue in a recent case . . . . In *Lomax*, we held that the felony[-]murder statute plainly dispensed with a culpable mental state, and that a felony DWI, which also does not require proof of a culpable mental state, may serve as the underlying felony. Appellant has not presented a new argument that would warrant our reconsideration of this issue.

*Id.* at 365–66 (citation omitted).

Relying on *Lomax* and *Bigon*, other Texas courts, including this one, have similarly held that the felony-murder statute does not require a culpable mental state. *See, e.g.*, *Gonzalez v. State*, 510 S.W.3d 10, 30 (Tex. App.—Corpus Christi–Edinburg 2014, pet. ref'd) (rejecting, in light of *Lomax* and *Bigon*, appellant's argument that State was required to prove a culpable mental state to convict him of felony murder); *Alami v. State*, 333 S.W.3d 881, 886 (Tex. App.—Fort Worth 2011, no pet.) (citing *Lomax* for the proposition that the felony-murder statute dispenses with a culpable mental state and that "[a] felony DWI offense may serve as the underlying felony in a felony-murder prosecution"); *Jones v. State*, No. 14-06-00879-CR, 2008 WL 2579897, at *4 (Tex. App.—Houston [14th Dist.] July 1, 2008, pet. ref'd) (mem. op., not designated for publication) ("[A]ppellant contends that the trial court erred in denying his motion to quash the felony murder indictment because the State failed to allege a culpable mental state. However, the Court of Criminal Appeals recently settled this issue against him."); *Castillo v. State*, No. 03-06-00331-CR, 2008 WL 2545055, at *1–2 (Tex.

17

App.—Austin June 26, 2008, pet. ref'd) (mem. op., not designated for publication) (rejecting, in light of *Lomax* and *Bigon*, appellant's argument that DWI cannot serve as the underlying felony in a felony-murder prosecution because it does not require a culpable mental state).

In light of the binding authority that speaks clearly on this issue from the Texas Court of Criminal Appeals and our own court, we decline Matthew's invitation to revisit this issue based on *Womble* and bald claims of alleged "legislative intent" to the contrary.[14] We thus overrule Matthew's second issue.

## B. Matthew's Complaint Regarding the Admission of the Crash Data Retrieval report

In her third issue, Matthew argues that the trial court abused its discretion by admitting the Crash Data Retrieval report generated from Matthew's vehicle. According to Matthew, the report failed to substantiate several criteria for scientific reliability. *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) (listing criteria that a court may consider in determining the reliability of scientific evidence).

In addressing this issue, we first consider whether Matthew has preserved it. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1);

---

[14]We note that *Womble* did not involve a felony-murder conviction. *See* 618 S.W.2d at 61, 64.

18

*Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). A party must object each time the objectionable evidence is offered. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.).

A party forfeits a complaint regarding the admission of an exhibit when testimony regarding the exhibit's contents is made without objection. *See, e.g.*, *Wadjun v. State*, No. 02-22-00029-CR, 2023 WL 1859888, at *5 (Tex. App.—Fort Worth Feb. 9, 2023, no pet. h.) (mem. op., not designated for publication) ("Any error in admitting the DPS lab report was forfeited when the same evidence came in without objection through the direct examination of Carroll."); *Reliford v. State*, No. 02-19-00269-CR, 2020 WL 938180, at *10 (Tex. App.—Fort Worth Feb. 27, 2020, pet. ref'd) (mem. op., not designated for publication) (holding that appellant forfeited complaint regarding admission of exhibit consisting of chart of text messages extracted from phone where witness later testified about text messages on the phone without objection); *Walker v. State*, No. 02-16-00418-CR, 2018 WL 1096060, at *4 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op., not designated for publication) ("Unobjected-to testimony about objected-to evidence results in forfeiture of the objection."); *Clay*, 361 S.W.3d at 767 ("[B]ecause Wallace provided testimony about the Louisiana records without objection before and after appellant's objection to the admission of the records and because appellant failed to obtain a

19

running objection, we conclude that he forfeited his objection to the records' admission.").

Here, during State Trooper Burger's testimony, the State offered into evidence the Crash Data Retrieval report generated from Matthew's vehicle. Matthew's counsel objected to the admission of the report, claiming that the State had failed to prove the report's reliability. Matthew's counsel made it clear that Matthew did not "object to any testimony about the report" but that she was instead objecting to the admission of the report itself. After conducting a hearing to consider the admissibility of the report, the trial court overruled Matthew's objection. Later in the trial, Evans, the accident reconstructionist, testified about the report's contents, mentioning the speed of Matthew's vehicle in the seconds before the crash as reflected in the report. Notably, Matthew did not raise any objection concerning Evans's testimony about the report's contents. Because she did not object to that testimony, Matthew has forfeited any complaint regarding the admission of the Crash Data Retrieval report. *See Wadjun*, 2023 WL 1859888, at *5; *Reliford*, 2020 WL 938180, at *10; *Walker*, 2018 WL 1096060, at *4; *Clay*, 361 S.W.3d at 767. We overrule Matthew's third issue.

## IV. CONCLUSION

Having overruled Matthew's three issues, we affirm the trial court's judgment.

20

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 23, 2023

21